**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 12-cr-00140-CMA

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**MICHAEL DESTRY WILLIAMS,**

**Defendant.**

_____

**REPORTER'S TRANSCRIPT**
**(Arraignment Hearing)**
_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 2:00 p.m. on the 8th
day of July, 2013, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
KENNETH MARK HARMON, U.S. Attorney's Office, 1225 17th St.
E., Seventeenth Street Plaza, Suite 799 , Denver, CO 80202

**FOR THE DEFENDANT:**
Pro Se
**STAND-BY COUNSEL:**
MARTHA ESKESEN, P.C., Martha H. Eskesen, 1720 S. Bellaire
St., Suite 501, Denver, CO 80222

1               **JULY 8, 2013**

2          (Proceedings commence at 2:00 p.m.)

3          THE COURT:  You may be seated.

4          Court calls Criminal Case No. 12-cr-00140-CMA,

5     encaptioned United States of America v. Michael Destry

6     Williams.

7          Counsel, would you please enter your appearances.

8          MR. HARMON:  Good afternoon, Your Honor, Kenneth

9     Harmon on behalf of United States.  And seated at the

10    Government's counsel table with me are the Government's

11    case agents, Trista Merz, an IRS Criminal Investigation

12    Division Special Agent, and Klaton Knabb, a Special Agent

13    with the Treasury Department.

14         THE COURT:  Good afternoon.

15         MS. ESKESEN:  Good afternoon, Your Honor, Martha

16    Eskesen, appearing as court-appointed CJA counsel.

17    However, I do have to let the Court know that Mr. Williams

18    does intend to exercise his right to represent himself,

19    and so I am here to be advisory counsel if that's what he

20    wishes, or do whatever I am required to do.

21         THE COURT:  All right.  That was going to be my

22    first item.

23         Mr. Williams, I see from the docket several times

24    you have invoked your right to proceed without counsel and

25    to represent yourself.

1           THE DEFENDANT:  I am reading your lips.

2           THE COURT:  Why are you reading my lips?  Can you

3    hear?

4           THE DEFENDANT:  No.  The echo in the room is

5    causing me trouble.

6           THE COURT:  Okay.  Do you need earphones?  We can

7    get you some earphones.  Is that better?  Can you hear me

8    better now?

9           MS. ESKESEN:  Judge, do you want to try speaking?

10          THE COURT:  Can you hear better?  Testing.

11   Testing.

12          MS. ESKESEN:  It is just fuzzy.

13          THE DEFENDANT:  Ma'am, I apologize, my name is not

14   Mr. Williams.

15          THE COURT:  What is your name?

16          THE DEFENDANT:  With all due respect, I have taken

17   my international right of self-determination, exercised

18   it.  I have taken an oath from an officer, witnessed and

19   duly recorded.  My proper name is Michael-destry Family of

20   Williams.  Please address me as Michael-destry.

21          THE COURT:  Michael Destry?

22          THE DEFENDANT:  The entity that is being charged

23   here is a trust, which I am a beneficiary of.

24          THE COURT:  Okay.  Michael Destry is what you wish

25   to be called?

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  All right.  Let's see if we can get you

3     some earphones that work.

4          THE DEFENDANT:  And with that, I see gold fringing

5     on the flag.  I am invoking Article III Common Law Court.

6          THE COURT:  You may do whatever you wish with

7     respect to that.  That is the flag that is in my

8     courtroom, and it is the flag that will remain in my

9     courtroom.

10          THE DEFENDANT:  Okay.  So, with that, ma'am, if you

11     do not give me and stipulate on the record that this is an

12     Article III Court, I have to notice you of your failure of

13     procedure, and notice you that as a public servant, I will

14     arrest your bond.

15          THE COURT:  You may take whatever action you deem

16     necessary.  This is an Article III Court.  I am an Article

17     III District Court Judge, appointed by the President and

18     confirmed by the Senate.

19          THE DEFENDANT:  Thank you, ma'am.

20          THE COURT:  All right.

21          THE DEFENDANT:  With that request, I would like a

22     lawfully arraignment.

23          THE COURT:  That is why we have you here before me.

24          Does that work better?  Can you hear?

25          THE COURT:  All right.  You seem to be able to

1    speak with me okay.  I will slow down.

2              THE DEFENDANT:  Thank you.

3              THE COURT:  All right.  And if at any time during

4    the course of this proceeding you don't understand what

5    I'm saying, please let me know and I will repeat it, okay?

6              THE DEFENDANT:  Yes, ma'am.

7              THE COURT:  All right.  So, before we can -- I can

8    let you proceed yourself, to represent yourself, the

9    United States Supreme Court has said I have to give you

10   certain advisements, okay.  So that's what I am going to

11   do right now.  First thing I need to do, though, is have

12   you take --

13             THE DEFENDANT:  Excuse me, ma'am.  I just

14   stipulated, I am not the defendant here, okay?

15             THE COURT:  Well, you are the charged defendant,

16   and you can present whatever defense you want when we get

17   to trial.  But, at this point, I am going to proceed.

18   Because you don't want to proceed with your lawyer, I have

19   to do certain advisements.  So you can raise whatever

20   defenses you want, but that's not the issue.

21             THE DEFENDANT:  I understand.  I must give you

22   notice.  I request at this time that the documents be put

23   in my name, otherwise it is a commercial dishonor and I

24   will accept that dishonor.  Either charge me in my lawful

25   name, as it has been recorded, otherwise I will have to

1    accept a dishonor.

2            THE COURT:  All right.  Well, you have been charged

3    as Michael Destry Williams.  I will refer to you as

4    Michael Destry, but the Indictment is in the name that the

5    Government deems is appropriate.  So we will proceed with

6    that.

7            THE DEFENDANT:  I object, ma'am.

8            THE COURT:  You can object.

9            THE DEFENDANT:  If you continue, I will have to

10   notice you.

11           THE COURT:  You may take whatever action you want.

12   We are going to continue.

13           THE DEFENDANT:  With one other statement that all

14   public officials -- sorry ma'am.  All public officials are

15   fired and they do not represent me.  She is acting as

16   assistance of counsel only to me, the living man, not to

17   the trust.

18           Please proceed.

19           THE COURT:  Thank you.  All right.  Would you

20   please stand so that you can be administered an oath.

21           THE DEFENDANT:  For what?

22           THE COURT:  To tell me the truth.  I have to ask

23   you some questions, and I need to have the truth told, so

24   she will administer an oath to you.

25           COURTROOM DEPUTY:  Please raise your right hand.

1            **MICHAEL DESTRY WILLIAMS**

2    having been first duly sworn, answers questions of the

3    Court as follows:

4            THE DEFENDANT:  Yes, ma'am.

5            THE COURT:  All right.  You may be seated.

6            All right.  Now, with that oath, do you understand

7    that your answers to my questions have to be completely

8    truthful?

9            THE DEFENDANT:  Uh-huh.

10           THE COURT:  I need to have you say yes or no.

11           THE DEFENDANT:  Yes, ma'am.

12           THE COURT:  All right.  And do you understand that

13   if you answer any of my questions falsely, that could be

14   the basis for a separate prosecution against you for

15   perjury or making a false statement?

16           THE DEFENDANT:  Uh-huh.

17           THE COURT.  Yes or no?

18           THE DEFENDANT:  Yes, ma'am.

19           THE COURT:  All right.  And, as I told you before,

20   if you don't understand what I am asking you or what I am

21   telling you, I need you to let me know so that I can

22   clarify for you, okay?

23           THE DEFENDANT:  Yes, ma'am.

24           THE COURT:  All right.  What is your true and

25   correct full name?

1          THE DEFENDANT:  Michael-destry Family of Williams.

2          THE COURT:  All right.  And how old are you?

3          THE DEFENDANT:  Approximately 49 years old.

4          THE COURT:  What level of school did you complete?

5          THE DEFENDANT:  Sixteen.  Is that what you are

6     looking for?

7          THE COURT:  You did 4 years of college, as well?

8          THE DEFENDANT:  Six, actually.

9          THE COURT:  So you have 18 years?

10          THE DEFENDANT:  I don't have a document.

11          THE COURT:  And I take it that you don't have any

12     problems reading or writing in English?

13          THE DEFENDANT:  No, ma'am.

14          THE COURT:  All right.  Now, are you under the

15     influence of any type of drugs, narcotics or alcohol?

16          THE DEFENDANT:  No.  I am just disabled.  Six

17     different surgeries that cause me extensive pain being on

18     concrete floors.  And I have mercury poisoning and

19     infection from my chest to my head.

20          THE COURT:  All right.  And are you taking --

21          THE DEFENDANT:  So if I start shaking and hurting,

22     that is what it is from.

23          THE COURT:  All right.  Are you taking any type of

24     medicine?

25          THE DEFENDANT:  Seven years ago, the licensed

1    medical community sent me home and called it septic.  Ever

2    since then, I went pure natural.  So after 30 years of

3    that, I have gone natural on oils, herbs, except I do not

4    take any western or pharmaceuticals any longer.

5         THE COURT:  All right.  Do you know if you suffer

6    from any diagnosed form of mental illness or emotional

7    disability?

8         THE DEFENDANT:  No, ma'am.

9         THE COURT:  Okay.  And is there anything at all

10   about how you feel right now that prevents you from

11   understanding what is happening in this hearing?

12        THE DEFENDANT:  I am doing good right now, thank

13   you.

14        THE COURT:  All right.  Now, has anyone told you

15   you shouldn't use a lawyer?

16        THE DEFENDANT:  No.

17        THE COURT:  Okay.  Have you ever represented

18   yourself in a trial before?

19        THE DEFENDANT:  Many times.

20        THE COURT:  All right.  And in what type of

21   proceedings?

22        THE DEFENDANT:  It has been proceedings just like

23   this.

24        THE COURT:  Okay.  Where you were charged with

25   evading taxes?

1        THE DEFENDANT:  There has been traveling issues.

2    There has been DUI issues that were through the corporate

3    statutes and this and that.  So I defended them correctly

4    and successfully.

5        THE COURT:  All right.  So were you convicted in

6    any of those cases?

7        THE DEFENDANT:  All but the last one, where they

8    hand picked a jury, hand picked a judge, and hand picked

9    the DA.  And I have witnesses where they were telling the

10   jury how to find me guilty.

11       THE COURT:  All right.  So one case you were found

12   guilty, and the others you were found not guilty?

13       THE DEFENDANT:  Correct.  The other ones, I

14   basically -- what I want to say is, I know they are a

15   corporation.  And I negotiated so that we could both go

16   our separate ways.  I don't look at it as guilty, because

17   I have no jurisdiction under here.  All I did was

18   negotiate so I could be free of them.

19       THE COURT:  All right.  Now, have you read the

20   Indictment in this case?

21       THE DEFENDANT:  No.  I do not have any glasses.

22       THE COURT:  All right.  Do you understand that this

23   Indictment charges you -- it is a Superseding Indictment,

24   so it is amended.  It charges you with three counts of

25   failing to file income tax returns and failing to pay your

1    income taxes for the years 2005, 2006 and 2007.

2           There is one count of structuring transactions to

3    evade any reporting requirements for your income, two

4    counts of bank fraud, three counts of fraud relating to

5    fictitious obligations, and one count of corrupt

6    interference with the administration of the internal

7    revenue laws.

8           That is essentially what you are charged with, so

9    10 counts all together.

10          THE DEFENDANT:  Objection.  The entity is charged,

11   not me.

12          THE COURT:  All right.  Michael Destry Williams is

13   charged with that.

14          THE DEFENDANT:  Correct, my trust.

15          THE COURT:  Okay.  Now, have you discussed these

16   charges with any attorney?

17          THE DEFENDANT:  No need to.

18          THE COURT:  All right.  And you do not wish to

19   proceed with Ms. Eskesen as your attorney; is that

20   correct?

21          THE DEFENDANT:  Just as an assistance of counsel

22   only.

23          THE COURT:  Advisory counsel?

24          THE DEFENDANT:  That's it.  Assistance of counsel.

25          THE COURT:  Do you need water?  There is some

```
 1    water.
 2          THE DEFENDANT:  It is the pain in the chest, ma'am.
 3          THE COURT:  All right.  Now, do you understand --
 4    and, Mr. Harmon, correct me if I am wrong, but Mr. Michael
 5    Destry, if you are found guilty, the maximum penalty you
 6    could receive for Counts 1 through 4 is not more than 5
 7    years of imprisonment.  Counts 5 and 6, however, is up to
 8    30 years of imprisonment.  Counts 7 through 9 are up to 25
 9    years of imprisonment.  And Count 10 is not more than 3
10    years of imprisonment.
11          So those are some pretty serious consequences if
12    you are convicted.
13          THE DEFENDANT:  The name isn't Mr., it is
14    Michael-destry.
15          THE COURT:  All right.  Mr. is a term of respect.
16          THE DEFENDANT:  Yes.  I understand the corporate
17    charges that have been placed within their jurisdiction.
18    But, as I said again, I am not the entity.
19          THE COURT:  I understand that is your defense.
20          THE DEFENDANT:  No, it is not a defense, it is a
21    fact.  I already have a default judgment which they should
22    have picked up, okay, a judgment that was handled by tax
23    returns.  I have affidavits sent to them where they failed
24    to respond and have never given me a commercial
25    presentment like this before.  This has been going on 15
```

1    years.

2          THE COURT:  All right.  Those are matters that we

3    will discuss if this case goes forward.  At this point, do

4    you have any questions of me about the charges or the

5    possible consequences and penalties if you are found

6    guilty of these 10 counts?

7          THE DEFENDANT:  I cannot be found guilty, so I

8    cannot say yes.

9          THE COURT:  Do you have any questions --

10         THE DEFENDANT:  I am not under this jurisdiction,

11   so I will not give you permission.  You do not have

12   permission to keep trying to make me the defendant.

13         THE COURT:  All right.  All I am asking you is if

14   you understand the charges that have been filed against

15   Michael Destry Williams.

16         THE DEFENDANT:  No.

17         THE COURT:  Do you have any questions of me that

18   you would like to ask me so that I can explain them to

19   you?

20         THE DEFENDANT:  I do not understand the charges,

21   okay, because I am not the entity, and I will not accept

22   it.

23         THE COURT:  All right.

24         THE DEFENDANT:  Are we clear on this?

25         THE COURT:  I need to remind you -- by the United

1    States Supreme Court, I need to remind you, before I can

2    allow counsel to withdraw and allow you to proceed on your

3    own, I need to advise you of the ways that having a lawyer

4    represent you would be to your advantage.  Now --

5         THE DEFENDANT:  Ma'am, you are talking to me as the

6    defendant.  I am being polite and nice here, okay.

7         THE COURT:  As far as I am concerned, you are the

8    defendant.  You can raise whatever defenses you want, but

9    you are the defendant, and I am going to advise you.

10        THE DEFENDANT:  I am here for a proper arraignment.

11        THE COURT:  This is the arraignment, but I cannot

12   proceed with it until -- because you don't want

13   Ms. Eskesen to represent you, I need to give you these

14   advisements by word of the United States Supreme Court.

15        THE DEFENDANT:  It is not me, okay?

16        THE COURT:  I understand.

17        THE DEFENDANT:  I have gone over this over and

18   over.  If you keep making me the defendant, ma'am, I am

19   going to notice you.

20        THE COURT:  You may do whatever you wish to do.

21        THE DEFENDANT:  Fine.  You are on your first

22   notice.

23        THE COURT:  All right.

24        THE DEFENDANT:  The next notice, basically, will be

25   set up to where if you continue through the three notices,

1    I will arrest your bond for the commercial dishonor,

2    extortion, conspiracy and racketeering with the

3    corporation.

4         THE COURT:  All right.  Do you understand that when

5    a person has no legal training to act as his own lawyer,

6    he is at a substantial professional disadvantage in his

7    case?

8         THE DEFENDANT:  Second notice.

9         THE COURT:  The Government has an experienced

10   lawyer representing it.  And that lawyer's legal knowledge

11   and experience may result in it being able to obtain

12   information of the case through use of discovery devices

13   that they are trained to use.

14        They may uncover -- a lawyer representing you could

15   get fact investigators, experts, mitigation specialists,

16   witnesses, grand jury transcripts.  They can uncover any

17   potential violations of your constitutional rights and

18   take effective measures to address them.  They could

19   ensure compliance with any speedy trial violations.  They

20   could identify and secure any favorable evidence that

21   could be used on your behalf later.

22        Now, I will tell you, Ms. Eskesen has represented a

23   number of defendants before me, and she is one of the

24   better criminal defense attorneys that exist.  A trial

25   lawyer has the experience and knowledge as to this entire

1    process that we use.  She would be -- Ms. Eskesen would be

2    on your side during the entire trial and would present the

3    best legal arguments for your defense.

4          Jury qualification and selection are governed by

5    numerous legal procedures, and a lawyer's knowledge and

6    experience in selecting a jury could enhance the jury

7    selection process in your favor.

8          Your lawyer can call witnesses for you, question

9    witnesses, present evidence on your behalf.  The lawyer

10   would talk with you and advise you on whether you should

11   testify, the consequences of that decision, and whether

12   you have -- what you have a right not to testify about.

13         A lawyer has studied the Rules of Evidence and will

14   know what evidence can and cannot come into your trial, so

15   she can object at the appropriate time.  The lawyer could

16   provide assistance in ensuring that the jury is given a

17   complete and accurate statement of the law that is to be

18   applied in your case.

19         That lawyer would also make effective closing

20   argument on your behalf, and could prevent improper -- or

21   object to improper argument by the prosecutor.  A lawyer

22   would ensure that any errors that are committed during

23   trial are properly preserved for appellate review later by

24   a higher court.

25         Now, if you are convicted, a lawyer's assistance

1    could be useful in preparing for sentencing, ensuring that

2    any favorable facts are brought to the attention of the

3    Court, ensuring that the Court is fully advised of all

4    legal available favorable dispositions, and ensure that

5    the sentence is lawfully imposed.  In addition, a lawyer's

6    knowledge and experience would be useful in filing of an

7    appeal.

8            Now, it is unwise for a lawyer, even, to represent

9    himself or herself in court.  But it is even less wise for

10   a non-trained person -- non-legally trained person to

11   represent himself.

12           And let me give you a few of the disadvantages.

13   You will not get any special treatment from this Court

14   just because you are representing yourself.  You will not

15   be entitled to a continuance simply because you wish to

16   represent yourself.  You will be limited to the legal

17   resources that are available to you while you are in

18   custody, if you are maintained in custody.  You won't be

19   entitled to any special library privileges just because

20   you are representing yourself.  And a lawyer has fewer

21   restrictions on their ability to research anything in your

22   defense.

23           Now, you are not required to possess the legal

24   knowledge and skill that an attorney must display in this

25   Court.  However, you will be required to abide by the

1    Rules of Criminal Procedure, the Rules of Evidence, and

2    the Rules of Courtroom Procedure and Protocol.  These are

3    rules that it took years for lawyers to learn.

4         And if you demonstrate that you are unwilling to

5    abide by the rules, I could terminate your

6    self-representation.  If you are disruptive in the

7    courtroom, I can terminate your self-representation and

8    remove you from the courtroom, in which case the trial

9    would have to proceed without your presence.

10         If you are acting as your own attorney, you are not

11    going to a be allowed to make speeches or testify unless

12    you take the stand and you assume the oath.  In

13    questioning a witness, either in direct or cross

14    examination, the examination at all times must be

15    courteous and it cannot be general.

16         Your access to the Government attorney, who is

17    prosecuting you, would be severely reduced as compared to

18    a lawyer, who easily can contact the Government attorney.

19         The Government is not going to go easier on you or

20    give you any special treatment because you are

21    representing yourself.  And, if you are convicted, you are

22    not going to be able to claim on appeal that your own lack

23    of legal knowledge or skill constitutes a basis for a new

24    trial.  In other words, you are not going to be able to

25    claim that you received ineffective assistance of counsel.

1          Now, do you understand all of these dangers and

2     disadvantages?

3          THE DEFENDANT:  I didn't even listen to them.  It

4     wasn't the defendant.  If you keep making me the

5     defendant, I will seize your bond.  Please be advised

6     public servant.

7          THE COURT:  All right.  Do you have any questions

8     of me about dangers or disadvantages?

9          THE DEFENDANT:  I didn't listen to them, so I can't

10    answer.

11         THE COURT:  All right.  I tried to give them to

12    you, and you have the ability to either listen or not

13    listen.  That is your choice.

14         Are you certain that you want to proceed to

15    represent yourself in this case and have Ms. Eskesen --

16         THE DEFENDANT:  I am not representing myself.  I am

17    not going to act as surety for the trust.  You have been

18    told that again and again.  I am trying to be very polite,

19    ma'am, with respect.

20         THE COURT:  I understand what you are saying, and I

21    am being very respectful of you, as well.

22         THE DEFENDANT:  Then please proceed correctly.

23         THE COURT:  I know how to proceed in my courtroom,

24    Michael Destry.

25         THE DEFENDANT:  Then let's just get this over with.

1    I accept your dishonor.

2         THE COURT:  My question is --

3         THE DEFENDANT:  May I finish?

4         THE COURT:  -- do you still want to proceed without

5    representation of counsel?

6         THE DEFENDANT:  I accept your dishonor for this

7    commercial conspiracy, extortion and racketeering.  You

8    are not recognizing my international right to

9    self-determination.  You are not following public

10   procedures in a lawful Article III Court of Common Law

11   arraignment to identify whether the parties are who they

12   are.

13        You are shoving it down my throat, so I have to

14   arrest your bond.  I will not -- all public officials are

15   fired.  And I will not participate in this commercial

16   dishonor.  So please do not address me any longer.

17        THE COURT:  All right.  I am taking that as an

18   affirmative answer to the question that you wish to

19   proceed to represent yourself.

20        THE DEFENDANT:  Nope.  I did not say anything.

21        THE COURT:  Well, that is how I am interpreting it

22   as.

23        THE DEFENDANT:  You said you would give me a lawful

24   arraignment.

25        THE COURT:  I need to get through this before I can

1    get to that.

2         THE DEFENDANT:  No, ma'am, you do not.  I do know

3    the law.

4         THE COURT:  At this point, Ms. Eskesen, I will

5    allow you to withdraw as his appointed counsel.  I will

6    appoint you as stand-by counsel to assist in whatever

7    manner he may deem necessary for his defense in this case.

8         MS. ESKESEN:  Thank you, Your Honor.

9         THE COURT:  Michael Destry, you will still be

10   responsible for the organization and content of presenting

11   your case.  You have the entire responsibility for your

12   own defense.  Ms. Eskesen will be here if you have

13   questions of her or need assistance in any way.  And, if

14   at any time you wish to have counsel appointed,

15   Ms. Eskesen will be re-appointed to represent you.

16        The Court has advised Mr. Williams of the risks and

17   limitations of proceeding pro se, and has inquired into

18   his ability and willingness to represent himself in this

19   Court and abide by the rules of the Court and the Rules of

20   Criminal Procedure and Evidence.

21        The Court finds that he has knowingly, voluntarily

22   and intentionally waived his rights under the United

23   States Constitution to have a court-appointed lawyer to

24   represent him.

25        The Court finds that Mr. Williams is exercising his

1   right under the case of _Faretta_ and its progeny to

2   represent himself in these proceedings.

3        All right.  At this point, then, I asked you,

4   Michael Destry, if you had any questions about the charges

5   against you in the Indictment.  Do you have any of me at

6   this time?

7        THE DEFENDANT:  I already made my statement.  I am

8   not going to participate.  If you keep continuing to

9   harass me, I will add another charge to the first one.

10        THE COURT:  All right.  Do you wish -- I guess at

11   this time, I am going to ask for a formal reading of the

12   Superseding Indictment by Mr. Harmon.

13        MR. HARMON:  Certainly, Your Honor.  And I believe,

14   given the defendant's pronouncements that he has not read

15   the Indictment, I intend to read it verbatim, word for

16   word.

17        THE COURT:  Yes.

18        MR. HARMON:  The Indictment is captioned Criminal

19   Case No. 12-cr-00140, United States of America, plaintiff,

20   v. Michael Destry Williams, also known as Will Williams.

21        The Indictment then has a listing of the charges,

22   and the text reads as follows:  The Grand Jury charges

23   that -- and a series of general allegations follows, as I

24   read them.  At all times material to this Indictment:

25        1.  The defendant, Michael Destry Williams was a

1    resident of Pueblo and Pueblo County, Colorado.

2        2.  Defendant Williams was self-employed as a

3    general contractor focusing primarily on residential

4    construction projects, including roofing, remodeling and

5    the repair and restoration of residential structures

6    sustaining fire and water related damage.

7        3.  Defendant Williams was also self-employed as a

8    real estate investor involved in the purchase, renovation

9    and resale, commonly known, as "fixing and flipping," of

10    residential properties.

11        4.  Greenview Construction, Inc., hereinafter,

12    "Greenview," was a Colorado corporation through which

13    defendant Williams primarily conducted his general

14    contractor construction business.

15        Defendant Williams was the beneficial owner of 100%

16    of the shares of Greenview, was its sole or principal

17    officer, and was responsible for overseeing and controlled

18    all facets of the operation of Greenview.

19        5.  M.D. Williams, Inc., hereinafter, "MDW, Inc.,"

20    and M.D. Williams Enterprises, Inc., hereinafter, "MDWE,"

21    its successor, were Colorado corporations through which

22    defendant Williams primarily conducted his real estate

23    investment business.

24        Defendant Williams was the beneficial owner of 100%

25    of the shares of MDW, Inc. and MDWE, was their principal

1    officer, and was responsible for overseeing and controlled

2    all facets of their operations.

3         6.  Colorado Housing & Investment Program, L.L.C.,

4    hereinafter, "CHIP," was a Colorado limited liability

5    company that primarily consisted of a small group of

6    individual investors who pooled their funds and extended

7    short-term construction financing and bridge loans for

8    residential real estate construction projects.  CHIP's

9    primary source of income was the interest that it charged

10   on these loans.

11        CHIP made distributions of the interest that it was

12   paid on these loans and the other profits that it realized

13   from its operations quarterly to its members on a pro rata

14   basis in accordance with its members' principal investment

15   in CHIP.  CHIP reported the payments that it made to its

16   members, including members' individual shares of its

17   income, both to its members and the Internal Revenue

18   Service, hereinafter, "IRS," on an annual basis in IRS

19   Schedules K-1 that were prepared and issued together and

20   in connection with CHIP's annual federal income tax

21   returns.

22        7.  Defendant Williams was a member of CHIP,

23   investing in the limited liability company in an

24   individual capacity.

25        COUNT 1:

1          8.   The allegations set forth in paragraphs 1

2     through 7 of this Indictment are hereby re-alleged as if

3     set out in full and incorporated herein by reference.

4          9.   From at least on or about April 1, 2005, and

5     continuing until at least on or about January 11, 2008,

6     the exact dates being unknown to the Grand Jury, in the

7     State and District of Colorado, the defendant, Michael

8     Destry Williams, also known as Will Williams, did

9     willfully attempt to evade and defeat the assessment of a

10    substantial amount of income tax and self-employment tax

11    due and owing by him to the United States of America for

12    calendar year 2005, by failing to make an income tax

13    return on or before April 17, 2006, as required by law, to

14    any proper officer of the IRS, by failing to pay to the

15    IRS said income tax and self-employment tax, and by

16    engaging in and causing the following acts:

17         A.   Over the course of April 2005 through July

18    2005, issuing checks to himself from Greenview's bank

19    account totaling $4,500, which checks he then caused to be

20    recorded in Greenview's accounting books and records as

21    payments by Greenview for consulting fees;

22         B.   Over the course of July 2005 through November

23    2005, causing CHIP to issue checks for its quarterly

24    distributions to him through checks made payable to MDW,

25    Inc., which checks he then deposited into a bank account

1    for MDW, Inc. and MDWE;

2         C.  Following his receipt of CHIP's Schedule K-1

3    for him for 2005, reporting the foregoing and other

4    payments to him from CHIP over the course of 2005,

5    contending that his investment in CHIP was through his

6    corporations, MDW, Inc. and MDWE, and not individually,

7    and sending a letter dated April 10, 2006 to CHIP's

8    accountant indicating that the use of his social security

9    account number in the Schedule K-1 as the taxpayer

10   identification number, hereinafter, "TIN," for the

11   investment was fraudulent and incorrect and that the

12   TIN for MDWE was the correct TIN to be used for tax

13   reporting purposes for his investment in CHIP;

14        D.  On or about November 28, 2005, in connection

15   with his sale of a real estate parcel located at 333 W.

16   Hidalgo Drive, Pueblo, Colorado, a property that he held

17   individually, executing an IRS Form W-9 falsely

18   representing that the seller of the 333 W. Hidalgo Drive

19   property was MDW, Inc. and identifying MDWE's TIN

20   as the TIN for the seller, thereby causing the title

21   company conducting the closing of the sale of this

22   property to report the proceeds that he received on the

23   sale to be reported to the IRS under MDWE's TIN;

24        E.  In or about late November or early December

25   2007, representing to an accountant whom he had engaged to

1    prepare corporate federal income tax returns for Greenview

2    and MDWE, hereinafter, the "corporate return tax

3    preparer," that both corporations were not owned directly

4    by him but rather through a purported trust, which he

5    identified as "Millstone," which owned all the shares of

6    both corporations;

7         F.   In connection with the foregoing

8    representation, applying to the IRS for a TIN for

9    Millstone and representing in the application that the

10   trustee of Millstone was an individual identified herein

11   as "R.M.McK," a sub-contractor who worked for defendant

12   Williams in his construction business;

13        G.   Providing the corporate return tax preparer

14   with a letter from the IRS, dated December 5, 2007,

15   issuing a TIN to Millstone, through its purported trustee,

16   R.M.McK;

17        H.   On or about December 7, 2007, signing and then

18   causing to be filed with the IRS a corporate income tax

19   return for Greenview, on IRS Form 1120, for the year 2005,

20   which return:

21        1.   Represented that Millstone Trust owned 100

22   percent of the shares of Greenview; and

23        2.   Represented that Greenview had paid no wages or

24   salaries, no officer compensation and no dividends to

25   defendant Williams and which incorporated payments that he

1    had, in fact, received from Greenview for 2005 into a

2    broader category of consulting fees and other costs of

3    goods sold by the corporation for the year.

4         I.  On or about January 11, 2008, signing and then

5    causing to be filed with the IRS a corporate income tax

6    return for MDWE, on IRS Form 1120, for the year 2005,

7    which return:

8         1.  Represented that Millstone owned 100 percent of

9    the shares of MDWE; and

10        2.  Represented that MDWE had paid no wages or

11   salaries, no officer compensation and no dividends to

12   defendant Williams and which incorporated payments that he

13   had, in fact, received from MDWE for 2005 into a broader

14   category of purchases that MDWE had made for the year, a

15   component of its costs of goods sold.

16        In violation of Title 26, United States Code,

17   Section 7201 and Title 18, United States Code, Section 2.

18        COUNT 2:

19        10.  The allegations set forth in paragraphs 1

20   through 7 of this indictment are hereby re-alleged as if

21   set out in full and incorporated herein by reference.

22        11.  From at least on or about November 9, 2005 and

23   continuing until at least on or about January 11, 2008,

24   the exact dates being unknown to the Grand Jury, in the

25   State and District of Colorado, the defendant -- then the

1    defendant is captioned in the same way as before -- did

2    willfully attempt to evade and defeat the assessment of a

3    substantial amount of income tax and self-employment tax

4    due and owing by him to the United States of America for

5    calendar year 2006, by failing to make an income tax

6    return on or before April 17, 2007, as required by law, to

7    any proper officer of the IRS, by failing to pay to the

8    IRS said income tax and self-employment tax, and by

9    engaging in and causing the following acts:

10        A.  On or about November 9, 2005, executing, and

11   causing an employee, an individual identified herein as

12   "DRCW," and an associate to execute various documents

13   purporting to create a trust in the name of "Skyview,"

14   which documents, among other things, described DRCW as

15   the "settlor" of the trust and defendant Williams as a

16   manager of the trust;

17        B.  On or about April 13, 2006, in his purported

18   capacity as trust manager, opening a brokerage account

19   with RBC Dain Rauscher, hereinafter, "RBC," in the name of

20   Skyview, and representing DRCW's social security account

21   number as the account holder's social security account

22   number/employer identification number on the account

23   opening documents;

24        C.  Over the course of June 2006 through November

25   2006, issuing checks made payable to Skyview from

1    Greenview's bank account totaling $91,000, which checks he

2    then caused to be recorded in Greenview's accounting books

3    and records as payments by Greenview for consulting fees

4    to Skyview; depositing said checks into Skyview's RBC

5    brokerage account; and using the proceeds of said checks

6    for various purposes;

7          D.  Over the course of August 2006 through October

8    2006, issuing checks made payable to Skyview from MDWE's

9    bank account totaling $13,000, which checks he then caused

10   to be recorded in Greenview's accounting books and records

11   as payments by MDWE for consulting expenses and profit

12   payments to an associate; depositing said checks into

13   Skyview's RBC brokerage account; and using the proceeds of

14   said checks for various purposes;

15         E.  On or about March 30, 2006, in connection with

16   his sale of a real estate parcel located at 427 Morrison

17   Avenue, Pueblo, Colorado, a property that he held

18   individually, executing an IRS Form W-9 falsely

19   representing that the seller of the 427 Morrison Avenue

20   property was MDW, Inc., thereby causing the title company

21   conducting the closing of the sale of this property to

22   report the proceeds that he received on the sale to be

23   reported to the IRS under MDWE's TIN;

24         E.1.  In connection with the foregoing sale,

25   directing the title company to make the seller's proceeds

1   check, in the amount of approximately $24,233, payable to

2   MDW, Inc.; depositing the check into a bank account for

3   MDWE; and thereafter recording the deposit as a management

4   fee to MDWE in its accounting books and records;

5       F.  On or about August 22, 2006, in connection with

6   his sale of a real estate parcel located at 1806 E. 8th

7   Street, Pueblo, Colorado, a property that he held

8   individually, executing an IRS Form W-9 falsely

9   representing that the seller of the 1806 E. 8th Street

10  property was MDW, Inc., and identifying MDWE's TIN as

11  the TIN for the seller, thereby causing the title company

12  conducting the closing of the sale of this property to

13  report the proceeds that he received on the sale to the

14  IRS under MDWE's TIN;

15      F.1.  In connection with the foregoing sale,

16  directing the title company to make a seller's proceeds

17  check, in the amount of approximately $7,397, payable to

18  MDW, Inc.; depositing the check into a bank account for

19  MDWE; and thereafter recording the deposit as investment

20  fee income to MDWE in its accounting books and records;

21      G.  Engaging in the affirmative acts described and

22  set forth in sub-paragraphs 9A through 9G of this

23  indictment, which sub-paragraphs are hereby re-alleged

24  as if set out in full and incorporated herein by

25  reference;

1          H.  On or about December 7, 2007, signing and then

2   causing to be filed with the IRS a corporate income tax

3   return for Greenview, on IRS Form 1120, for the year 2006,

4   which return:

5          1.  Represented that Millstone Trust owned 100

6   percent of the shares of Greenview; and

7          2.  Represented that Greenview had paid no wages or

8   salaries, no officer compensation and no dividends to

9   defendant Williams, and which characterized payments that

10  he had, in fact, received in the name of Skyview from

11  Greenview for 2005 as consulting expenses and incorporated

12  them into a broader category of other costs of goods sold

13  by the corporation for the year.

14         I.  On or about January 11, 2008, signing and then

15  causing to be filed with the IRS a corporate income tax

16  return for MDWE, on IRS Form 1120, for the year 2006,

17  which return:

18         1.  Represented that Millstone owned 100 percent of

19  the shares of MDWE;

20         2.  Represented that MDWE had paid no wages or

21  salaries, no officer compensation and no dividends to

22  defendant Williams and which incorporated payments that he

23  had, in fact, received from MDWE, through Skyview, for

24  2006 into a broader category of purchases that MDWE had

25  made for the year or sub-contractor expenses of MDWE, both

1    components of its costs of goods sold; and

2         3.   Included payments that defendant Williams

3    received as proceeds on the sales of the 427 Morrison

4    Avenue and 1806 E. 8th Street properties as gross receipts

5    of MDWE for 2006.

6         In violation of Title 26, United States Code,

7    Section 7201 and Title 18, United States Code, Section 2.

8         COUNT 3:

9         12.   The allegations set forth in paragraphs 1

10   through 7 of this indictment are hereby re-alleged as if

11   set out in full and incorporated herein by reference.

12        13.   From at least on or about January 29, 2007,

13   and continuing until at least on or about April 15, 2008,

14   the exact dates being unknown to the Grand Jury, in the

15   State and District of Colorado, the defendant, did

16   willfully attempt to evade and defeat the assessment of a

17   substantial amount of income tax and self-employment tax

18   due and owing by him to the United States of America for

19   calendar year 2007, by failing to make an income tax

20   return on or before April 15, 2008, as required by law, to

21   any proper officer of the IRS, by failing to pay to the

22   IRS said income tax and self-employment tax, and by

23   engaging in and causing the following acts:

24        A.   Over the course of January 2007 through August

25   2007, causing at least $7,800 in checks issued to him by

1    CHIP to be deposited into Skyview's brokerage account at

2    RBC;

3         B.   On or about May 18, 2007, causing a check in

4    the amount of approximately $67,000 to be issued by a

5    title company and made payable to Skyview, representing

6    the repayment of principal and interest of a short term

7    loan extended by defendant Williams, through Skyview,

8    and depositing that check into Skyview's brokerage

9    account at RBC.

10        In violation of Title 26, United States Code,

11   Section 7201 and Title 18, United States Code, Section 2.

12        COUNT 4:

13        14.  The allegations set forth in paragraphs 1

14   through 5 of this indictment are hereby re-alleged as if

15   set out in full and incorporated herein by reference.

16        15.  At all times material to this indictment,

17   Sunflower Bank was a domestic financial institution

18   required, pursuant to Section 5313(a) of Title 31, United

19   States Code, and the regulations promulgated thereunder,

20   to file with the Secretary of Treasury a Currency

21   Transaction Report on FinCen Form 104 for each deposit,

22   withdrawal, exchange of currency or other payment or

23   transfer by, through or to such institution which involved

24   a transaction in currency of more than $10,000.

25        16.  From on or about July 28, 2008 through on or

1    about September 29, 2008, the exact dates being unknown to

2    the Grand Jury, in the State and District of Colorado, the

3    defendant, directly and through a person known to the

4    Grand Jury, did, for the purpose of evading the reporting

5    requirements of Section 5313(a) of Title 31, United States

6    Code, and the regulations promulgated thereunder,

7    structure, cause to be structured, and did command,

8    counsel and assist in structuring a transaction or

9    transactions with domestic financial institutions, to wit,

10   the conversion of approximately $92,100 in funds on

11   deposit in a brokerage account with RBC Dain Rauscher,

12   account number 1101-7601-3631, opened by defendant

13   Williams on behalf of Skyview Trust, hereinafter, "Skyview

14   Trust Account," into United States currency, through the

15   following transactions with and involving Sunflower Bank:

16        There is a table of transactions set out consisting

17   of two columns.  The first column being the date of the

18   transaction, the second column being the transaction,

19   itself.  The first entry in this table is for 7/28/2008.

20   The transaction is:  Negotiation of Skyview Trust Account

21   Check No. 1003 in the amount of $9,400, payable to an

22   individual identified herein as R.M.McK, in exchange for

23   $9,400 in U.S. currency.

24        Next entry is dated 7/28/08:  Negotiation of

25   Skyview Trust Account Check No. 1004 in the amount of

1    $9,400, payable to Will Williams, in exchange for $9,400

2    in U.S. currency.

3         The next transaction is dated August 15, 2008:

4    Negotiation of Skyview Trust Account Check No. 1006 in the

5    amount of $9,800, payable to Will Williams, in exchange

6    for $9,800 in U.S. currency.

7         The next transaction is dated August 22, 2008:

8    Negotiation of Skyview Trust Account Check No. 1005 in the

9    amount of $9,800, payable to Will Williams, in exchange

10   for $9,800 in U.S. currency.

11        The next transaction, dated August 28, 2008:

12   Negotiation of Skyview Trust Account Check No. 1014 in the

13   amount of $9,800, payable to Michael Desty D-E-S-T-Y [sic]

14   Williams, in exchange for $9,800 in U.S. currency.

15        Next transaction is dated September 3, 2008:

16   Negotiation of Skyview Trust Account Check No. 1015 in the

17   amount of $3,000, payable to Michael Desty [sic] Williams,

18   in exchange for $3,000 in U.S. currency.

19        Next transaction dated September 4, 2008:

20   Negotiation of Skyview Trust Account Check No. 1017 in the

21   amount of $5,000, payable to an individual identified

22   herein as R.M.McK, in exchange for $5,000 in U.S. currency

23        Next transaction is dated September 10, 2008:

24   Negotiation of Skyview Trust Account Check No. 1018 in the

25   amount of $9,800, payable to Michael Desty [sic] Williams,

1   in exchange for $9,800 in U.S. currency

2        The next transaction is dated September 19, 2008:

3   Negotiation of Skyview Trust Account Check No. 1020 in the

4   amount of $9,800, payable to Michael Desty [sic] Williams,

5   in exchange for $9,800 in U.S. currency.

6        Next transaction is dated September 19, 2008:

7   Negotiation of Skyview Trust Account Check No. 1021 in the

8   amount of $6,500, payable to an individual identified

9   herein as R.M.McK, in exchange for $6,500 in U.S.

10  currency.

11       The final transaction in the table is dated

12  September 29, 2008:  Negotiation of Skyview Trust Account

13  Check No. 1024, in the amount of $9,800, payable to

14  Michael Desty [sic] Williams, in exchange for $9,800 in

15  U.S. currency.

16       In violation of Title 31, United States Code,

17  Section 5324(a)(3) and (d); Title 31, Code of Federal

18  Regulations, Sections 103.22 and 103.63; and Title 18,

19  United States Code, Section 2.

20       COUNTS 5 and 6:

21       17.  The allegations set forth in paragraphs 1

22  through 5 of this indictment are hereby re-alleged as if

23  set out in full and incorporated herein by reference.

24       18.  From on or about November 5, 2009, and

25  continuing until on or about November 19, 2009, the exact

1    dates being unknown to the Grand Jury, in the State and

2    District of Colorado, the defendant, directly and through

3    a person known to the Grand Jury, devised a scheme and

4    artifice to defraud Colorado East Bank and Trust,

5    hereinafter, "Colorado East," a financial institution

6    whose deposits were and are federally insured.

7         19.  It was the purpose and object of the scheme

8    and artifice to defraud for the defendant, Michael

9    Williams, to obtain money from Colorado East by inflating

10   and creating fictitious balances in a checking account

11   which had previously been established and maintained with

12   the bank in the name of an individual identified herein as

13   R.M.McK, doing business as Greenview Construction

14   (Colorado East Account No. 1465699101), through the

15   deposit of worthless fabricated United States Treasury

16   checks drawn on a fictitious account purportedly for the

17   benefit of defendant Williams with the United States

18   Treasury Department.

19        20.  It was part of the scheme and artifice to

20   defraud that defendant Williams did fabricate and cause to

21   be fabricated checks purportedly drawn on a specifically

22   identified account with the United States Treasury,

23   Financial Management Services, c/o Treasury UCC Contract

24   Div., and made payable to Greenview Construction.

25   Defendant Williams then caused these checks to be

1   deposited to the aforementioned Greenview Construction

2   Account at Colorado East.

3        21.  As he then well knew, at no time did defendant

4   Williams have an account with the United States Department

5   of Treasury, and at no time were checks from the United

6   States Department of Treasury in the amounts indicated

7   issued to Greenview Construction.

8        22.  On or about the dates set forth below, as to

9   each of the enumerated Counts, in the State and District

10   of Colorado, the defendant, executed and attempted to

11   execute the aforesaid scheme and artifice to defraud, by

12   conducting, directly and through others, the transactions

13   set forth below:

14        There then proceeds a two-row table with columns;

15   "Count," "Date" and "Transaction."

16        And Count 5 reads:  Date:  November 9, 2009.

17   Deposit to Colorado East Account No. 1465699101 of a

18   purported check identified as United States Treasury Check

19   No. 1551, dated 11/5/09, in the amount of $25,000, payable

20   to Greenview Construction

21        Count 6, dated November 12, 2009.  Deposit to

22   Colorado East Account No. 1465699101 of a purported check

23   identified as United States Treasury Check No. 1553, dated

24   11/5/09, in the amount of $30,000, payable to

25   Greenview Construction.

1          All in violation of Title 18 United States Code

2    Sections 1344 and 2.

3          Counts 7 through 9, read as follows:

4          23.   The allegations set forth in paragraphs 1

5    through 5 and paragraphs 18 through 22 of this indictment

6    are hereby re-alleged as if set out in full and

7    incorporated herein by reference.

8          24.   On or about the dates set forth below, as to

9    each of the enumerated Counts, in the State and District

10   of Colorado, the defendant, with the intent to defraud,

11   did knowingly pass, present and utter, and attempt and

12   cause to be passed, presented and uttered, the following

13   false or fictitious instruments and items, appearing,

14   representing, and purporting to be actual financial

15   instruments issued under the authority of the United

16   States:

17         There then appears a three-row table with columns

18   for "Count," "Date" and "Purported United States Financial

19   Instrument" as follows:

20         Count 7, dated November 9, 2009.  A purported check

21   identified as United States Treasury Check No. 1551, dated

22   11/5/09, in the amount of $25,000, payable to Greenview

23   Construction, and issued by or on behalf of the United

24   States Treasury, through the Financial Management

25   Services, c/o Treasury UCC Contract Div.

1          Count 8, dated November 12, 2009.  A purported

2     check identified as United States Treasury Check No. 1553,

3     dated

4     11/5/09, in the amount of $30,000, payable to Greenview

5     Construction, and issued by or on behalf of the United

6     States Treasury, through the Financial Management

7     Services, c/o Treasury UCC Contract Div.

8          Count 9, dated February 3, 2010.  A purported check

9     identified as United States Treasury Check No. 1002, dated

10    1/14/2010, in the amount of $250,000, payable to The

11    Forth, [sic] spelled F-O-R-T-H, Judicial District Colorado

12    Dept. Of Justice," and issued by or on behalf of the

13    United States Treasury, through the Financial Management

14    Services, c/o Treasury UCC Contract Div.

15         In violation of Title 18 United States Code

16    Sections 514(a)(2) and Section 2.

17         Count 10, the final count, reads as follows:

18         25.  The allegations set forth in paragraphs 1

19    through 5 of this indictment are hereby re-alleged as if

20    set out in full and incorporated herein by reference.

21         26.  In or about August 2005, defendant Williams

22    was charged in the State of Colorado, El Paso County

23    District Court, for the Fourth Judicial District, in Case

24    No. 2005M6119, with criminal misdemeanor and traffic

25    offenses arising from and relating to a traffic

1    altercation on July 31, 2005, hereinafter, El Paso County

2    Case 05M6119.

3            Defendant Williams was convicted on

4    several of these charged offenses and sentenced in or

5    about August 2006 to pay a fine and serve a term of

6    probation.  Daniel Scott Wilson was a State of Colorado

7    district judge presiding in the case.

8            27.  In or about February 2006, defendant Williams

9    was charged in the State of Colorado, El Paso County

10   District Court, for the Fourth Judicial District, in Case

11   No. 2006M1224, with a criminal misdemeanor offense arising

12   from and relating to an October 2005 complaint of alleged

13   police misconduct made by him in connection with the July

14   2005 traffic altercation, hereinafter, El Paso County Case

15   06M1224.

16           Defendant Williams was convicted of the charged

17   offense and sentenced in or about October 2006 to a term

18   of days in jail.  Karla J. Hansen was a State of Colorado

19   district judge presiding in the case.

20           28.  In or about 2005, defendant Williams was sued

21   in a civil action brought in the State of Colorado, Pueblo

22   County District Court, for the Tenth Judicial District, in

23   Case No. 2005CV176, in connection with a contract and

24   property dispute, hereinafter, Pueblo County Case 05CV176.

25           The presiding State of Colorado district judge was

1    Victor I. Reyes.  On or about January 29, 2007, Judge

2    Reyes issued an order finding for the plaintiff in said

3    civil action and ordering defendant Williams to pay

4    plaintiff certain specified sums of money.

5        29.  On or about October 28, 2008, defendant

6    Williams caused to be mailed to Henry M. Paulson, Jr.,

7    then the Secretary of Treasury, correspondence and

8    documents requesting, and relating to a request, that

9    funds in a purported personal Treasury account, identified

10    by a number corresponding to his Social Security Account

11    Number, be used, among other things, to settle, pay and

12    resolve his disputes in El Paso County Case No. 06M1224

13    and Pueblo County Case 05CV176.

14        Among the documents defendant Williams caused to be

15    included in this mailing was an IRS Form 56, Notice

16    Concerning Fiduciary, purporting to appoint Paulson and

17    his successors as fiduciaries to act on behalf of

18    defendant Williams to settle accounts and disputes and in

19    connection with specified tax matters and a purported bond

20    entitled "Non-Negotiable Unlimited Private Bond For

21    Set-Off."

22        30.  Over the course of November 2008, defendant

23    Williams caused to be mailed to the Secretary of Treasury

24    Paulson correspondence and documents requesting, and

25    relating to a request, that $300,000,0000 be deposited to

1    the United States Treasury from defendant Williams'

2    purported Treasury Account for the purpose of settling his

3    various obligations, including obligations in El Paso

4    County Case 06M1224.

5        Among the documents defendant Williams caused to be

6    included in these mailings were IRS Forms 56 purporting to

7    appoint, among others, Judge Hansen, the Clerk of the El

8    Paso County District Court, and various El Paso County law

9    enforcement officials as his fiduciaries to settle

10   accounts and disputes in relation to Case 06M1224; copies

11   of court documents and docket sheets in Case 06M1224

12   stamped, in part, "Accepted for Value by drawee"; and

13   purported bonds in the amount of $300,000,000, entitled

14   "Discharging and Indemnity Bonds," which bonds included

15   Pueblo County Case 05CV176 and El Paso County Case 06M1224

16   and Judges Reyes and Hansen in a list of accounts and

17   account holders to be satisfied by the bonds.

18       31.  Beginning on or about October 28, 2008, and

19   continuing through on or about December 15, 2010, the

20   exact dates being unknown to the Grand Jury, in the State

21   and District of Colorado, and elsewhere, the defendant,

22   directly and through a person known and unknown to the

23   Grand Jury, did corruptly endeavor to obstruct and impede

24   the due administration of the internal revenue laws by the

25   following acts and means, among others:

1          A.  Causing to be mailed to the incumbent Secretary

2    of Treasury the correspondence and documents described in

3    paragraphs 29 and 30 of this indictment;

4          B.  Causing to be mailed to IRS offices in various

5    locations, together with other documents, IRS Forms 1099-A

6    identifying El Paso County, Colorado, as being a borrower

7    of unspecified funds loaned to it by defendant Williams,

8    in connection with El Paso Cases 06M1224 and 05M6119, and

9    identifying Pueblo County, Colorado, as being a borrower

10   of unspecified funds loaned to it by defendant Williams,

11   in connection with Pueblo Case 05CV176;

12         C.  Causing to be mailed to IRS offices in various

13   locations, together with other documents, government

14   contracting form documents – including completed form

15   payment bonds, performance bonds, bid bonds, and releases

16   of liens and sureties – purporting to settle matters

17   involving El Paso County Cases 06M1224 and 05M6119 or

18   relating to the attempted settlement of those cases;

19         D.  Causing to be mailed to IRS offices in various

20   locations, separately or together with other documents,

21   IRS Forms 56 appointing Judge Hansen and the Clerk of

22   the El Paso County District Court, among others, as

23   fiduciaries to settle matters involving El Paso County

24   Case 06M1224, and appointing Judge Wilson, among

25   others, to settle matters involving El Paso County Case

1    05M6119;

2         E.  Causing to be mailed to an IRS office

3    correspondence enclosing copies of court documents in El

4    Paso Case 06M1224, bearing stamps directing that the

5    documents be forwarded to the U.S. Treasury for payment,

6    and indicating that the documents should be used for

7    settling and closing the account relating to said case;

8         F.  Causing to be mailed to the Clerk of the El

9    Paso County District Court correspondence and a purported

10   United States Treasury Check for $250,000, as further

11   described in Count 9 of this indictment, together with

12   various IRS forms and other documents, purporting to

13   settle El Paso County Case 06M1224;

14        G.  Causing to be mailed, on or about May 29, 2009,

15   to Judges Hansen and Wilson in El Paso County and to Judge

16   Reyes in Pueblo County, criminal information referrals on

17   IRS Forms 3949-A, accusing each judge, among other things,

18   of failure to disclose borrowed funds, failure to return

19   borrowed funds, and failure to pay taxes on said funds and

20   accusing each judge with committing the following

21   particular income tax violations:  Failure to pay tax;

22   unreported income; and failure to file return, all in

23   apparent relation to his or her respective case involving

24   defendant Williams;

25        H.  Causing to be mailed, on or about March 29,

1   2010, to the IRS's Ogden, Utah, facilities and to the

2   IRS's Criminal Investigation Division in Covington,

3   Kentucky, together with copies of court documents and

4   docket sheets in El Paso Case 06M1224, stamped, in part,

5   "accepted for value," criminal information referrals on

6   IRS Forms 3949-A, accusing Judge Hansen and the Clerk of

7   the El Paso County District Court, identified by

8   individual name, each of failure to disclose borrowed

9   funds, failure to return funds to their beneficiary as

10  directed, and failure to pay taxes on said funds, and

11  accusing each judge of committing the following particular

12  income tax violations:

13       False or altered documents; failure to pay tax; and

14  unreported income; and

15       I.  Causing to be mailed, on or about December 15,

16  2010, to the IRS's Ogden, Utah, facilities, attention the

17  IRS's Criminal Investigation Division, together with

18  various IRS forms and other documents:

19       Correspondence, among other things, accusing

20  Judge Hansen and the Chief Judge of the El Paso County

21  District Court, together with seven other individuals,

22  identified as two El Paso County District Court clerks,

23  the El Paso County District Attorney and one of his

24  deputies, and various El Paso County law enforcement

25  officers, of failing to report and pay taxes in connection

1    with borrowed funds in apparent relation to El Paso Case

2    06M1224; and

3         Criminal information referrals on IRS Forms

4    3949-A, accusing Judge Hansen, and each of the other eight

5    individuals, among other things, each of failure to

6    disclose borrowed funds, failure to return principal to

7    the lender as directed, and failure to pay taxes on said

8    funds, and accusing each individual with committing the

9    following particular income tax violations:

10        Organized crime; false or altered documents;

11   failure to pay tax; and unreported income.

12        All in violation of Title 26, United States Code,

13   Section 7212(a), and Title 18, United States Code, Section

14   2.

15        A signature follows indicating that it is a True

16   Bill, signed by the foreperson, and a signature block

17   follows indicating that it has been signed on behalf of

18   the United States Attorney and by myself.

19        THE COURT:  Thank you very much, Mr. Harmon.

20        Michael Destry, how do you plead as to the 10

21   Counts charged in the Superseding Indictment; guilty, or

22   not guilty?

23        Michael Destry?  I am going to take your silence as

24   an indication that you are not prepared to enter a plea at

25   this time, so I am entering pleas of not guilty on your

1    behalf.

2            THE DEFENDANT:  Another violation against your

3    bond, ma'am.

4            THE COURT:  All right.  Scheduling order.

5            THE DEFENDANT:  Please note if you continue in this

6    manner, you will be working off your personal liability.

7    Your dishonor is very rude.  And you're lying to me about

8    an Article III Court with that flag in here.

9            I demand that you give me a certified copy of your

10   oath and a certified copy of your bond.

11           THE COURT:  You may demand all you wish, we are

12   proceeding.

13           THE DEFENDANT:  It is demanded.  Better to do it.

14           THE COURT:  Mr. Harmon.

15           THE DEFENDANT:  The fraud you are purporting on me

16   and my trust.

17           THE COURT:  All right.  Mr. Harmon, on the

18   scheduling order discovery conference, I am looking

19   through this for trial dates.  I have 30 days as July 27,

20   70 days as September 5th, and 90 days as September 25th.

21   I propose that we set this matter for trial on August

22   19th.

23           How long do you expect it will take?

24           MR. HARMON:  I have indicated 10 days.  Your Honor,

25   did you say August --

1          THE COURT:  The calculation I was given was August

2     -- I am sorry, July 27 for the 30 day, September 5th for

3     the 70 day, and September 25th for the 90 day.

4          MR. HARMON:  And did you indicate a trial date?

5          THE COURT:  A trial date of August 19th.  That is

6     because I had a 2-week trial scheduled, and that one looks

7     like it is going to be continued.

8          MR. HARMON:  All right.  Well, we will be ready

9     then.  We have indicated 10 business days for the

10    Government.

11         THE COURT:  This matter is therefore set for trial

12    on August 19 for two weeks.

13         Final trial prep conference August 12th; that is

14    the week before, at 1 o'clock, with jury selection to take

15    place at 1:30.  I pick my juries a week in advance.

16         MR. HARMON:  I am sorry, ma'am, did you say August

17    12th?

18         THE COURT:  1 o'clock for the final trial prep and

19    1:30 for jury selection.

20         Motions -- any motions to be filed, pretrial

21    motions, will be due no later than July 26, 2013.

22    Responses to those motions are due no later than August 6,

23    2013.

24         And what discovery has already been provided?

25         MR. HARMON:  I have not provided discovery as of

1    this point, Your Honor.  I would request two weeks from

2    today to provide discovery to the defendant.  I would

3    request, since the Government's discovery will be in

4    electronic format on a self-executing program that is

5    searchable, to provide the discovery disks to Ms. Eskesen,

6    as advisory counsel, so that she can provided the

7    discovery to the defendant.  That would be my proposal to

8    get discovery in that format to the defendant within two

9    weeks' time.

10            THE COURT:  All right.  I will order that those

11   discovery materials be provided, then, on or before July

12   22, 2013, to advisory counsel, Ms. Eskesen, so that they

13   can be provided to the defendant.

14            Now, there are reciprocal responsibilities here on

15   behalf of the defendant, but I am not sure how much we

16   will get in that regard.  I will leave that to see if

17   Ms. Eskesen can work out anything.  If there are any

18   documents he will need to present at trial, they will need

19   to be provided.

20            Is there anything else in the scheduling order that

21   I am supposed to take care of?

22            MR. HARMON:  I don't believe so, Your Honor.

23            THE COURT:  All right.  Then I will sign this

24   order, and I will leave it with Ms. Hartmann.

25            So, Ms. Hartmann, I will leave that for you.

1          That brings us to the detention hearing.  I

2    understand from what I have read that the Government

3    intends to seek to detain the defendant; is that correct?

4          MR. HARMON:  That's correct, Your Honor.

5          THE COURT:  All right.  Do you have any proffer --

6          MR. HARMON:  I do, Your Honor.

7          THE COURT:  -- you wish to make?  You may proceed.

8          MR. HARMON:  I will make a proffer of the facts

9    that we believe would show and support detention.  In the

10   course of proffering, if I drift into argument, my

11   apologies.  It is intended, however, just to be a proffer

12   of the facts.

13         I would ask first that the Court take judicial

14   notice of the pretrial services report where the

15   defendant's extensive criminal history, including four

16   failures to appear, are noted.  It is noted, as well, that

17   the defendant didn't provide any information about his

18   ties to the community, so none were seen, and that

19   probation is recommending detention, both on risk of

20   flight and danger to the community grounds.

21         I will proffer the conduct and statements of the

22   defendant that took place both at his initial appearance

23   before Magistrate Judge Tafoya and before Magistrate Judge

24   Hegarty.  The defendant appeared not to be able to follow

25   the directives of the Court in either of those

1    proceedings.

2         The defendant threw his -- did not follow along,

3    and threw his papers at Government's counsel table,

4    indicating at various points in varying levels of

5    coherence that he did not respect, acknowledge or accept

6    the jurisdiction or legitimacy of the Court, thereby

7    casting substantial doubt on whether the defendant could

8    abide by any conditions of release in this case, since he

9    does not acknowledge the authority of the Court issuing

10   those release conditions.

11        I would be prepared to call the Government's IRS

12   CID Case Agent Trista Merz.  She would testify as follows:

13   First she would testify that for the periods under

14   investigation of the defendant's conduct, which were from

15   early 2000 through early 2010, the agents doing the

16   investigation were able to determine that defendant had

17   lived in Pueblo and had been self-employed in two separate

18   businesses, as described in the Indictment.

19        However, as of 2010, he appeared to leave the

20   community and wound up his businesses, and none of the

21   associates or friends knew of him, nor according to local

22   law enforcement, did anybody in the community appear to

23   know where he had gone.

24        As of 2012, when the Indictment was returned, the

25   investigators had no idea where the defendant was or what

1   he was doing for a living, nor did any of the people I

2   interviewed indicate where he was.

3       The investigators ran records to try to find his

4   whereabouts.  They determined that the last known address

5   where he was living, an address on Cortner Street in

6   Pueblo, was occupied by another person.  Defendant had

7   provided no forwarding address that could be traced to

8   him.

9       Records checks revealed that any holdings that he

10  had in terms of property or vehicles were in other

11  person's names, so no leads were developed from that.

12      The defendant stopped filing corporate tax returns

13  after 2008, 2009, so there was no information from tax

14  documents that were generated to reflect his whereabouts.

15      A credit history report was run for the defendant,

16  and one item was found; a debit card associated with a Pay

17  Pal account for the defendant.  Through the debit card

18  transactions that were analyzed, the investigators were

19  able to determine, based on the frequency of the debit

20  card transactions and their nature, used for purchases of

21  gasoline, restaurants, and the like, that the defendant

22  had relocated outside the State of Colorado; that he

23  appeared to be living, according to these records, in

24  California in 2010, and then into Oregon into 2011.

25      The investigators were able to confirm that the

1    defendant at some point had been in California.  They

2    talked to his uncle, Ralph Williams, in 2010.  His uncle

3    said that he did not know of the defendant's whereabouts,

4    but that in May 2010, the defendant came to ask for

5    $10,000 in cash based on an arrangement that the defendant

6    had with Mr. Williams to -- Ralph Williams, to hold money

7    for him.

8           Mr. Williams, Ralph Williams, indicated that the

9    defendant was not married, had no children and only one

10   brother.  He indicated that he was estranged from the

11   brother and possible from other family members.

12          I would proffer, as well, defendant's mother, Ester

13   Williams, was in court last week for the appearance -- for

14   court appearances there before Judge Hegarty, and

15   confirmed that she and her other families members were, in

16   fact, estranged from the defendant, and had not seen him

17   since on or about 2008, and did not know that he was back

18   in town until recently.

19          Other evidence that we would show that defendant

20   had been in California included a traffic stop and

21   altercation in May 2011.  I will describe that in

22   connection with the defendant's criminal history in a

23   moment.

24          We would establish through the Agent's testimony

25   that this was not the first time that the defendant

1    suddenly left the established residence -- his established

2    residence and relocated; that there was a period of time

3    sometime in 2008, approximately for a 2-month period, that

4    the defendant left precipitously the Pueblo area, told a

5    business associate to conduct his business, and told the

6    associate that he was leaving at the time because he

7    believed that the FBI and the IRS were after him.

8         In fact, we would show that during this time frame,

9    during the 2008 year, IRS civil personnel had contacted

10   the defendant about auditing his 2004 tax returns.

11        The agent would testify about the circumstances of

12   apprehending the defendant; that a neighbor, who had

13   previously been contacted and was familiar with the

14   Cortner address, indicated recently, in April, that the

15   defendant -- a person matching the defendant's appearance,

16   had returned.

17        Visual surveillance reflected that the defendant

18   was, in fact, at the Cortner address.  Extended visual

19   surveillance indicated that he did not leave the property

20   or do anything indicating that he had employment outside

21   of his residence.

22        The Agent would describe the circumstances of his

23   arrest as being, essentially, non-confrontational after

24   Marshals located him at a convenient store near his

25   property.  The Agent would testify that one of the

1    Marshals escorting him had a conversation with the

2    defendant on the ride up, in which the defendant said that

3    he typically does not respect law enforcement, but that

4    when he saw the Marshals' guns and raid jackets and the

5    like, he figured that he would not mess with them because

6    they were not to be messed with.

7         If you give me a moment, I want to make sure I got

8    that right.  I want to talk to the Agent.

9         I say that not to be gratuitous, but to lead that

10   into an argument that I would make that the only authority

11   emanating from this Court that this defendant would

12   respect, I would submit, would be authority backed by raid

13   jackets and guns, and that is not the type of things that

14   could be fashioned for releases on condition -- for

15   conditions of release.  You cannot have a marshal with a

16   raid jacket and gun escorting the defendant.  So that

17   would be the defense's mindset, and that is why we would

18   proffer that.

19        The agent would testify that the IRS agents and

20   others in the investigation had no indication of where the

21   defendant was or what he was doing to support himself in

22   2010 until his arrest in this case in this year, last

23   couple of weeks.

24        The agent would also testify about views that the

25   defendant has expressed outside of these court proceedings

1 concerning the legitimacy of the federal government and

2 state governments and their authority over him.  These

3 views were indicated not just to associates, but in

4 filings with public -- with courts in cases that he had

5 and in recorded documents with the Pueblo County Clerk and

6 Recorder's office.

7   The defendant described himself in these documents

8 and to associates as a "sovereign citizen."  The agent

9 would explain that that term is commonly referred to by

10 people who hold themselves as being outside of the

11 jurisdiction and authority of the federal government and

12 its system.

13   We would offer as exhibits three different

14 documents recorded by the defendant in the State of

15 Pueblo -- in the County of Pueblo's Clerk and Recorder

16 Officer.  I will proffer those documents in a moment.  We

17 have an exhibit book to provide to the Court.

18   The Agent would also testify that the defendant

19 claimed to be a member of something called the Pembina

20 Nation Little Shell Band of North America, which was

21 described as an Indian tribe that was not beholden to the

22 authority of the federal government, that allowed him to

23 drive with license plates issued by that entity and

24 identification from that entity.

25   THE COURT:  What was the name of the entity?

1           MR. HARMON:   The Pembina, P-E-M-B-I-N-A, Nation

2    Little Shell Band of North America.

3           Although the Court has the run of the defendant's

4    criminal history, it does not have all of the criminal

5    history.   The Case Agent would review with the Court

6    narratives of various incidents that led to arrests and

7    convictions by the defendant.

8           These would include a discussion of the traffic

9    stop that took place in May 2011.   Basically, in that

10   traffic stop, the defendant was found to have -- was

11   stopped for speeding, and was found to have loaded

12   weapons.   He claimed that he was in California on his way

13   to Oregon, and further to Canada, so that he could use

14   medical marijuana without being hassled.

15          Defendant, at the time of his stop, provided an

16   identification that was not a recognized identification.

17   It was determined that he did not have a valid Colorado's

18   driver's license.   Guns were found in his car.   He was

19   found to be uncooperative on the scene.

20          The guns included a Phoenix Arms .22 caliber pistol

21   with an inserted magazine with five .22 caliber rounds,

22   knives, other weapons, a police scanner, all described in

23   the report that we would provide to the Court as an

24   exhibit.

25          Defendant was arrested on various charges as a

```
1    result of that traffic stop in 2011 in California,

2    including possession of a concealed weapon, possession of

3    a loaded weapon, and possession of marijuana.  He was

4    given a notice to appear for further court proceedings on

5    July 15, 2011.  He did not appear, and an active warrant

6    remains outstanding for his arrest in that case.

7         The Agent would describe other traffic incidents

8    where the defendant was uncooperative in articulated views

9    about not being be beholden to the authority of the United

10   States Government or state authorities.

11        In these traffic stops -- some of these traffic

12   stops, he indicated that he was a federal marshal, and

13   that the officers interacting with him did not have

14   authority over him.  As a result, in some of these he --

15   as a result of some of these stops he was arrested for

16   impersonation of a peace officer.

17        There was a Texas case, a traffic stop in Texas

18   that is not reflected in the NCIC criminal history

19   printout provided to the Court by the pretrial services

20   office; that is from traffic stop in Texas on January 12,

21   2005.  We would offer the incident or arrest report

22   described that incident; the defendant's

23   uncooperativeness, the fact that loaded weapons were found

24   in his vehicle.

25        We would then offer a police or incident report to
```

1   show another traffic stop on July 31, 2005, in Colorado

2   Springs, showing similar uncooperativeness by the

3   defendant.

4       Another instance where the defendant had loaded

5   weapons in his vehicle and refused to comply with law

6   enforcement directives.

7       Testimony in the records would show that he went to

8   trial on this case and was convicted, among other things,

9   of obstructing a police officer.

10      The agent would testify that based on a review of

11  the records, the judicial records, the defendant made a

12  report -- and this is reflected in the Indictment, made a

13  report to internal affairs in El Paso County alleging

14  police misconduct.  That report was determined to be

15  baseless, and the defendant was charged with a separate

16  misdemeanor criminal case of false reporting.  That is a

17  case that referenced in the Indictment.  It was assigned

18  to Judge Hansen.

19      The defendant was tried by a jury in October 2006

20  for that offense.  He was found guilty and ordered to

21  serve 90 days in jail.  The Agent would testify that he

22  appealed that sentence, and so the execution of the

23  sentence was stayed during the appeal.

24      However, in December 2007, the appeal was

25  dismissed, and Judge Hansen ordered the defendant to

1    appear in her courtroom for the conclusion of proceedings.

2    The defendant failed to appear.  According to court

3    records, docket sheets, apparently somebody purporting to

4    act on the defendant's behalf, said that he was

5    hospitalized the night before.

6          A bench warrant was issued, nonetheless, for his

7    failure to appear.  That remained unexecuted.  But the

8    defendant never appeared again in Judge Hansen's court.

9    However, the docket sheets would show that the defendant

10   made repeated filings in the case thereafter, and

11   acknowledged at one point that there was an outstanding

12   failure to appear warrant issued for him.

13         And, in fact, some of the correspondence that he

14   directed to Judge Hansen included a photocopy of the

15   arrest warrant, with some stamp saying "for value

16   accepted," with some type of language that suggests that

17   he was trying to discharge that failure to appear warrant

18   with his treasury account that is reflected -- that is

19   described in the Indictment.

20         We would offer that to show that the defendant knew

21   that he was supposed to return to court and willfully and

22   deliberately failed to appear in court.  That warrant

23   remains outstanding, as well.

24         Finally, the agent would testify about interviews

25   with certain prospective witnesses in this case who are

1    familiar with defendant's demeanor and temperament.  They

2    describe the defendant as having a violent and explosive

3    temper and demeanor, and they expressed concern for their

4    safety.

5         One particular witness specifically indicated that

6    he or she was concerned for her safety -- his or her

7    safety, if it was found out by the defendant that that

8    person had spoken with the IRS.

9         Of course, we would also provide evidence

10   concerning the criminal referrals that were made by the

11   defendant to the IRS of alleged tax violations on the part

12   of judicial officers that were handling defendant's case.

13        That is a proffer of the evidence through the

14   testimony of the case agents.  I have prepared for the

15   Court and for the defendant a book of exhibits that would

16   be introduced in connection with that testimony.  All of

17   these documents are either court records or are official

18   government agency police records.

19        Exhibit 1 is an Affidavit in Support of a

20   Warrantless Arrest in connection with a traffic stop in

21   December 2004 with regard to the defendant, where the

22   defendant identified himself as being a Pembina Nation

23   Little Shell Band member and a marshal.

24        Exhibit 2 is a Texas Department of Public Safety

25   Traffic Enforcement Division Report that describes the

1    Texas traffic stop on January 25, 2005, and the

2    disposition of that case.

3         Exhibit 3 is a supplement to a Colorado Springs

4    Police Department report that provides a narrative of the

5    traffic stop on July 3, 2005, including the circumstances

6    of defendant's arrest and the weapons that were found on

7    his possession at that time.

8         Government Exhibit 4 is a bill of particulars that

9    the State of Colorado filed -- the People of Colorado

10   filed in the false reporting case, describing for the

11   Court the factual scenario leading up to the false

12   reporting, including the traffic stop and the false

13   reporting, itself.

14        Government's Exhibit 5 is a photocopy of

15   correspondence that the defendant sent to Judge Hansen on

16   December 4, 2010.  It includes, in particular, on the

17   final page, a copy of the warrant for failure to appear,

18   with a stamp on it, reading "accept for value.  Exempt

19   from levy.  December 4, 2010," and proceeds to identify

20   some type of treasury account for Michael-destry Williams.

21        Government Exhibit 6 is the notice to appear and

22   the arrest and investigation report for the California

23   stop in 2011.

24        Government's 7 is a document that the defendant

25   filed with the Pueblo County Clerk and Recorder's Office

1   in September 2009 that expresses his view about the

2   authority of the government over him.

3        Government's Exhibit 8 is a similar document filed

4   with the Clerk and Recorder for the El Paso County -- for

5   the County of El Paso.

6        And Government's Exhibit 9 is another document that

7   we offer to indicate the defendant's written views about

8   the authority of various governments over him.

9        I have these in an exhibit book.  I would offer

10  them for purposes of these proceedings.  I will provide

11  Ms. Eskesen with a defense copy.

12        With the Court's permission, I will hand the book

13  to the courtroom deputy.

14        May I have a moment.  I think I am done with my

15  proffer.

16        THE COURT:  You may.

17        Ms. Hartmann, may I have the notebook, please?

18        MR. HARMON:  Thank you for your patience, Your

19  Honor.  I would rest on that proffer.

20        THE COURT:  All right.  Michael Destry, do you wish

21  to make any proffer with respect to whether I should

22  detain you?

23        All right.  No response from the defendant.  Based

24  on the --

25        THE DEFENDANT:  Ma'am, third time.  Keep it up.

1        THE COURT:  All right.  Under the Bail Reform Act,

2    a defendant may be detained pending trial if the judicial

3    officer finds that no condition or combination of

4    conditions will reasonably assure the appearance of that

5    person as required, and the safety of any other person in

6    the community.  That is under 18 United States Code

7    Section 3142(e), also (b) and (c).

8        The Government does have the burden of proof, and

9    it must prove risk of flight by a preponderance of the

10    evidence and dangerousness to any other person or to the

11    community by clear and convincing evidence.  Pursuant to

12    United States v. Cisneos, 328 F.3d 610, Tenth Circuit,

13    2003.

14        The Bail Reform Act establishes the following

15    factors are to be considered in determining whether there

16    are conditions of release that will reasonably assure the

17    appearance of the defendant and the safety of the

18    community:

19        First, the nature and circumstances of the offenses

20    charged, including whether the offenses are a crime of

21    violence or involve a narcotic drug, neither of which are

22    involved in this case.

23        Second, the weight of the evidence against the

24    person.

25        Third, the history and characteristics of the

1     person, including the person's character, physical and

2     mental condition, family ties, employment, financial

3     resources, length of residence in the community, community

4     ties, past conduct, history relating to drug and alcohol

5     abuse, criminal history, and record concerning appearance

6     at court proceeding.

7          And, (b), whether at the time of the current

8     offense or arrest the person was on probation or on parole

9     or on any other release pending trial, sentencing appeal

10    or completion of sentence for an offense under federal,

11    state or local law.

12         And, fourth, the nature and seriousness of the

13    danger to any person or the community that would be posed

14    by the person's release.

15         On balance, based on the proffer that has been made

16    and the Court's own review of the documents filed in this

17    case, the Court finds that the factors weigh in favor of

18    detention.  The Court finds as follows when weighing the

19    statutory factors set forth in the Bail Reform Act:

20         First, the defendant has been charged in the

21    Superseding Indictment with three counts of evasion and

22    aiding and abetting -- tax evasion, rather, and aiding and

23    abetting the same.  One count of structuring transactions

24    to evade reporting requirements and aiding and abetting

25    the same.  Two counts of bank fraud and aiding and

1    abetting the same.  Three counts of fictitious obligations

2    and aiding and abetting the same.  And one count of

3    interfering with the administration of the internal

4    revenue law and aiding and abetting the same.

5            Based upon the Indictment and the proffer that was

6    made here today, probable cause exists that the defendant

7    did commit these charged offenses.  The Court notes that

8    based on the proffer and the exhibits submitted by the

9    Government and the pretrial services report, it has been

10   demonstrated by a preponderance of the evidence that the

11   defendant has four failures to appear, two of which remain

12   outstanding.

13           These have resulted in the issuance of warrants for

14   his arrest, the most recent being from California in 2011

15   due to his failure to appear in court for charges relating

16   to carrying a loaded firearm in his vehicle.  As far as

17   the Court can tell, these charges in California remain

18   pending.  The Court also notes that it took a year for the

19   defendant to be found and arrested on current charges.

20           The defendant has refused to meet or speak with the

21   probation officer, so his familial, residential,

22   community, employment, property and financial ties to the

23   District of Colorado or elsewhere are unknown.  Although

24   the Court noted that there did not seem to be any reports

25   of his employment for at least the last several years.

1        The defendant refuses to acknowledge the authority

2    of this Court, and his attitude in court proceedings has

3    been quite negative, including being disruptive, throwing

4    paperwork, threatening the Court, all of which demonstrate

5    that he has no respect for the federal court system.

6        After considering all appropriate factors, I

7    conclude by a preponderance of the evidence that there is

8    no condition or combination of conditions that would

9    reasonably assure the appearance of the defendant at

10   future court proceedings.

11       There has been a proffer of some sort -- and the

12   Court has experienced that the defendant has a violent

13   temper and considers himself above the law.  Therefore,

14   the Court finds also by clear and convincing evidence that

15   he is a danger to others.

16       Accordingly, the Court orders that the defendant be

17   detained without bond.  He is committed to the custody of

18   the Attorney General or their designated representative

19   for confinement in a correction facility separate, to the

20   extent practicable, from persons awaiting or serving

21   sentences or being held in custody pending appeal.

22       It is further ordered that the defendant be

23   afforded a reasonable opportunity, if he so wishes, to

24   consult confidentially with advisory counsel.  And it is

25   further ordered that upon order of this Court or on

1    request of an attorney for the United States of America,

2    the person in charge of the correction facility shall

3    deliver defendant to the United States Marshal for the

4    purpose of an appearance in connection with this

5    proceeding.

6              Is there anything further?

7              MR. HARMON:  Nothing on behalf of the United

8    States, Your Honor.

9              THE COURT:  Michael Destry, anything further on

10   your behalf?

11             Maintaining his silence, the Court finds that he

12   apparently has nothing further.

13             Court will be in recess.  The defendant will be

14   remanded.

15             (Proceedings conclude at 3:36 p.m.)

16

17

18

19

20

21

22

23

24

25

1

2

3          **R E P O R T E R ' S     C E R T I F I C A T E**

4

5

6          I, Darlene M. Martinez, Official Certified

7    Shorthand Reporter for the United States District Court,

8    District of Colorado, do hereby certify that the foregoing

9    is a true and accurate transcript of the proceedings had

10   as taken stenographically by me at the time and place

11   aforementioned.

12

13

14          Dated this 12th day of August, 2013.

15

16

17          _____

18          s/Darlene M. Martinez

19          RMR, CRR

20

21

22

23

24

25