**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 12-cr-00140-CMA

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**MICHAEL DESTRY WILLIAMS,**

**Defendant.**

_____

**REPORTER'S TRANSCRIPT**
**(Supervised Release Violation Hearing)**

_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 9:57 a.m. on the 9th
day of July, 2020, Alfred A. Arraj United States
Courthouse, Denver, Colorado.

**A P P E A R A N C E S**

**FOR THE PLAINTIFF:**
ANDREA LEE SURRATT, U.S. Attorney's Office, 1801
California St., Suite 1600, Denver, CO 80202

**FOR THE DEFENDANT:**
KELLY LYNNE MEILSTRUP, Second-Chair, 1600 Stout St., Suite
1400, Denver, CO 80202

**I  N  D  E  X**

**WITNESSES:**                                                    **PAGE**

**PROBATION OFFICER JOEL NELSON**
DIRECT EXAMINATION BY MS. SURRATT                              9
CROSS-EXAMINATION BY MS. MEILSTRUP                            21

**E  X  H  I  B  I  T  S**

**NO.**                                                      **ADMITTED**

1    ........................................    13
2    ........................................    15
3    ........................................    16
4    ........................................    19

| | |
|---|---|
| 1 | **JULY 9, 2020** |
| 2 | (Proceedings commence at 9:57 a.m.) |
| 3 | THE COURT:  You may be seated. |
| 4 | Court calls Criminal Case No. 12-cr-00140-CMA, |
| 5 | encaptioned United States of America v. Michael Destry |
| 6 | Williams. |
| 7 | The Court notes that the Government is present and |
| 8 | represented by Ms. Surratt.  The Court also notes that |
| 9 | Mr. Williams is present in the courtroom.  The Court also |
| 10 | notes that stand-by counsel, Ms. Meilstrup, is also |
| 11 | present, and that Officer Joel Nelson is also present in |
| 12 | the courtroom. |
| 13 | Now, before we get started, I need to explain how |
| 14 | we are going to proceed.  For the protection of everyone |
| 15 | in this courthouse and in the courtroom, and for the |
| 16 | general protection of the public, I am allowing only the |
| 17 | defendant and his attorney and/or his stand-by counsel, |
| 18 | the Assistant United States Attorney, and the probation |
| 19 | officer to appear before me in person, at least until we |
| 20 | get a better understanding of how COVID-19 is actually |
| 21 | spread. |
| 22 | Family members and friends of the defendant, as |
| 23 | well as the general public, are able to listen to the |
| 24 | proceedings via a public telephone line. |
| 25 | Now, we have gone to great lengths to make sure |

1    that we achieve social distancing of at least 6 feet.  No

2    one in the courtroom is to leave his or her seat at any

3    time unless I give you permission to do so.  No one will

4    go to the podium.  No one needs to stand to address me.

5    Everyone is to remain seated and speak into the microphone

6    at his or her respective table.  No one is to remove his

7    or her mask at any time.

8              Now, Mr. Williams, I need you to put on your mask.

9              THE DEFENDANT:  No, ma'am.

10             THE COURT:  Why are you not willing to put on your

11   mask?

12             THE DEFENDANT:  Because you keep violating my

13   rights.  There is a habeas corpus sitting on this court --

14   three of them, actually, and you have suspended habeas

15   corpus.  You refuse to follow procedures.  You refuse to

16   give me my Seventh Amendment right to suits at common law.

17   You are not a judge.  You do not have an oath of office

18   that is required by the Constitution; the Colorado

19   Constitution, Article 12, Section 8, 9, and 10, or a

20   fiduciary bond or by the National Constitution, Article 6,

21   Section 3, I believe.

22             So, therefore, you are impersonating a public

23   official.  Your flag, you are flying an admiralty flag.  I

24   am not a United States citizen, ma'am.  You have known

25   this from the start, since 2013.

1          You have refused to give me suits at common law and

2     take me to the District Court of the United States, the

3     true constitutional court of this republic nation, and you

4     bring me before your court, a united states district court

5     of corporate court under an admiralty jurisdiction in

6     special law, not judicial law.

7          THE COURT:  Mr. Williams, at the last hearing, on

8     January 23, 2020, you indicated that you wished to

9     represent yourself in this hearing.  That is your

10    constitutional right, but I am required to ensure that

11    your waiver of counsel is knowingly, voluntarily, and

12    intelligently made.

13         At the prior hearing, you refused to answer any of

14    my questions, you became extremely disruptive and

15    disrespectful.  You refused to let me speak.  You refused

16    to answer the questions I needed to ask you.  So I had no

17    choice but to continue that hearing and reschedule it for

18    a later date.

19         And, unfortunately, then the COVID-19 pandemic

20    intervened, and it took several months before we could

21    bring you back to court.  So I am hoping that today we can

22    actually move forward on this hearing on the supervised

23    release violation petition.

24         However, I guess I need to ask whether or not you

25    are willing to answer the questions that I need to ask you

1    to make sure that your decision to waive your right to

2    counsel is knowingly, voluntarily, and intelligently made.

3           Are you willing to do that?

4           THE DEFENDANT:  Let me straighten out the record.

5    First of all, it is you that keep cutting me off in the

6    other hearings.  It is who you have been belligerent and

7    rude and violating my First Amendment right, refusing me

8    to speak and be heard.  It is you who are refusing me my

9    Sixth Amendment right to counsel.

10          At no time have I been belligerent or rude or

11   violent in any civil manner whatsoever.  All I have done

12   is exercise my constitutional rights as a citizen of the

13   sovereign union states; AKA, an American National.  You

14   have committed fraud and perjury upon the record.  It has

15   been noted by a criminal complaint of four additional

16   people.

17          So you've stated again that I have been abusive and

18   won't answer your questions.  When there is a habeas

19   corpus upon the record, no other proceedings must go forth

20   until that is adjudicated --

21          THE COURT:  All right --

22          THE DEFENDANT:  -- and you have not adjudicated the

23   habeas corpus.  You have not gotten persona or subject

24   matter jurisdiction in this case.  I am not a United

25   States citizen, I am an American national.  Your

 1    corporation under your commercial laws has no jurisdiction

 2    over an American national.

 3          THE COURT:  All right.  At this point,

 4    Mr. Williams, you are refusing to put on your mask, so you

 5    are exposing everybody in this courtroom to the potential

 6    of COVID.  You are refusing to answer my questions with

 7    respect to whether or not you can waive your right to

 8    counsel and that that waiver is knowingly, voluntarily,

 9    and intelligently made.  And so I am going to ask the

10    Marshals to remove you to the --

11          THE DEFENDANT:  I have already told you that I've

12    waived counsel --

13          THE COURT:  -- cell.

14          THE DEFENDANT:  -- and you have not brought up my

15    rights to habeas corpus.  And if you speak without me in

16    here, it is more of your fraud, and you are assaulting me

17    again, stopping me from being heard, and committing

18    perjury and lies the record.

19          (Defendant removed from courtroom.)

20          THE COURT:  All right.  For the record, it was my

21    hope that I would be able to ask Mr. Williams the

22    questions that I need to ask pursuant to a *Faretta*

23    colloquy to ensure that his decision to waive the right to

24    counsel was voluntarily and intelligently made.  He

25    refuses to answer my questions.  He has the same

 1     statements to make about being an American national.

 2             When I issued the order appointing Ms. Meilstrup as

 3     his stand-by counsel, I made it clear that if he was not

 4     willing to cooperate and if he was disruptive in court in

 5     his refusing to wear a mask in the midsts of this COVID

 6     pandemic, when everybody else is wearing a mask, is not

 7     acceptable.  He is refusing to answer the questions I need

 8     to ask.  Therefore, I cannot find that his waiver is

 9     knowingly, voluntarily, and intelligently made.

10             So we are going to go ahead and proceed.  We are

11     here today -- actually, in trying to be proactive, when I

12     appointed Ms. Meilstrup, I appointed her as stand-by

13     counsel, and indicated that she would need to take over in

14     the event that Mr. Williams had to be removed from the

15     courtroom, as he was today.

16             She has done her best to prepare, but I understand

17     that Mr. Williams has refused to talk to her.  His family

18     has refused to talk to her.  They have accused her of all

19     of the same things that he has accused me of here today.

20             He is in the holding cell.  He can hear what we

21     say, he just can't participate.  And that is why

22     Ms. Meilstrup was appointed to serve as his stand-by

23     counsel.

24             All right.  So, Ms. Surratt, is the Government

25     prepared to move forward to prove the allegations of the

1    petition?

2           MS. SURRATT:  Yes, Your Honor.

3           THE COURT:  You may call your first witness.

4           MS. SURRATT:  Your Honor, the Government calls

5    Probation Officer Joel Nelson.

6           COURTROOM DEPUTY:  May I have your attention,

7    please.

8                   **PROBATION OFFICER JOEL NELSON**

9    having been first duly sworn, testified as follows:

10          THE WITNESS:  I do.

11          COURTROOM DEPUTY:  Please be seated.

12          Sir, please state your name and spell your first

13   and last names for the record.

14          THE WITNESS:  Joel Nelson.  J-O-E-L N-E-L-S-O-N.

15          MS. SURRATT:  To confirm, you would like me to sit?

16          THE COURT:  Everybody remain seated at the tables,

17   speaking through masks.  And I ask you speak slowly,

18   articulate as much as you can, and speak into the

19   microphone so that Ms. Martinez can take down everything

20   said.

21          MS. SURRATT:  Yes, Your Honor.

22                       **DIRECT EXAMINATION**

23   **BY MS. SURRATT:**

24   Q.   Mr. Nelson, where do you work?

25   A.   The United States Courts, as a probation officer, in

1    Colorado Springs.

2    Q.   How long have you been a probation officer?

3    A.   Since 2008.

4    Q.   What are your duties and responsibilities as a United

5    States Probation Officer?

6    A.   I supervise a caseload of people who have been placed

7    on probation or supervised release.

8    Q.   Are you familiar with a supervisee named Michael

9    Destry Williams?

10   A.   Yes, I am.

11   Q.   Are you his probation officer for purposes of

12   supervised release?

13   A.   Yes, I am.

14   Q.   Approximately when did Mr. Williams begin

15   supervision?

16   A.   Mr. Williams originally released to a detainer in El

17   Paso County.  He was released from that detainer on

18   October 25, 2018, and that is his start date of

19   supervision.

20   Q.   Are you familiar with Mr. Williams' conditions of

21   supervised release?

22   A.   Yes, I am.

23   Q.   And did you meet with Mr. Williams to discuss those

24   conditions of supervised release?

25   A.   Yes, I did.

1    Q.   Can you explain what you did when you met with

2    Mr. Williams?

3    A.   It was on two separate occasions that I met with

4    Mr. Williams.  The first occasion we just kind of met and

5    talked about the expectations of supervision.  I gave him

6    a copy of his judgment.  He wanted to review all of the

7    paperwork before signing anything or asking me any

8    questions.

9         So, approximately four days later, I met with him

10   again and completed the rest of the intake, read all of

11   the conditions to him, explained them, answered any

12   questions he might have.

13   Q.   Has Mr. Williams violated his supervised release

14   conditions since his supervision began?

15   A.   Yes, he has.

16   Q.   As to each of the alleged violations, are those

17   conditions that you had discussed with Mr. Williams?

18   A.   Yes.

19   Q.   And did you prepare a violation petition in

20   connection with the violations of supervised release?

21   A.   Yes, I did.

22   Q.   All right.  Lets talk about those violations one at a

23   time.  Turning first to Violation No. 1, what was the

24   condition of supervised release that underlies this

25   violation?

1    A.   That he didn't report to the probation officer and

2    submit written reports, as directed.

3    Q.   And what are written reports, from a probation

4    officer's perspective?

5    A.   A written report is just kind of an overview of

6    statistical information about what they have done the

7    prior month while on supervision.  It contains information

8    about, you know, if they've changed their address, their

9    employment, any vehicles, financial information, if they

10   had any contact with law enforcement, if they attended any

11   treatment, things of that nature.

12   Q.   And to whom does a supervisee submit these monthly

13   reports?

14   A.   He submits them to the probation office; to me, in

15   particular.

16   Q.   And in this case, what did Mr. Williams do to violate

17   this condition of his supervised release?

18   A.   Mr. Williams was initially compliant with this

19   condition.  However, in April he submitted his monthly

20   report, along with a notice and demand to cease and desist

21   letter, believing that we no longer had jurisdiction of

22   him, and he stopped submitting monthly reports after that,

23   after April.

24   Q.   Could you turn to what is marked as Government

25   Exhibit 1 in the binder in front of you.  Do you recognize

1    this document?

2    A.    Yes, I do.

3    Q.    What is it?

4    A.    It is the initial monthly report form that he

5    completed.

6    Q.    And by "he," you mean Mr. Williams?

7    A.    Correct.

8    Q.    And how did this form come into your possession?

9    A.    He completed this form the initial day that he

10   reported to the probation office, on October 26, 2018.

11   Q.    And were you there when he completed this form, or

12   did he give it to you after completion?

13   A.    Yes, he did, and then I met with him.

14        MS. SURRATT:   The Government offers Government

15   Exhibit 1 into evidence.

16        THE COURT:   Exhibit 1 is admitted.

17        (Exhibit No. 1 is admitted.)

18   Q.   (BY MS. SURRATT)   Looking at pages 1 and 2 of

19   Government Exhibit 1, Officer Nelson, what are these

20   pages?

21   A.    This is the standard monthly report form that he

22   would complete every month and send in to me.

23   Q.    And did Mr. Williams, in fact, complete pages 1 and 2

24   of this form?

25   A.    Yes, he did.

1    Q.   And what are the rest of pages of Government Exhibit

2    1, pages 3 through 21?

3    A.   When we initially met on October 26, he had kind of

4    spoke about whether or not the Court had jurisdiction or

5    not.  And these documents he provided to me that he had

6    filed with the Court at some point in time.

7    Q.   And are these documents, in pages 3 through 21, a

8    part of probation officer's required documents?

9    A.   No.

10   Q.   Could you please turn to what is marked as Government

11   Exhibit 2 in your binder.  Do you recognize this?

12   A.   Yes, I do.

13   Q.   What is it?

14   A.   These are the monthly reports that he submitted after

15   his initial meeting with me.

16   Q.   And are these monthly reports from December 2018 to

17   March of 2019?

18   A.   It appears, yes.

19   Q.   And how do you recognize these documents?

20   A.   Just from Mr. Williams -- his handwriting, what he

21   writes on the reports, and that they came from him via

22   mail.

23   Q.   So he sent them to you via mail; is that correct?

24   A.   Correct.

25        MS. SURRATT:  The Government offers Government

1   Exhibit 2.

2          THE COURT:  Any objection?

3          MS. MEILSTRUP:  No objection.

4          THE COURT:  2 is admitted.

5          (Exhibit No. 2 is admitted.)

6   Q.  (BY MS. SURRATT)  And looking at pages 3 and 4,

7   Officer Nelson, what is this, pages 3 and 4?

8   A.   Pages 3 and 4 are an additional financial form that I

9   asked him to complete along with his monthly report.

10  Since he has had outstanding financial obligations with

11  the Court, we typically use this form for anyone with

12  restitution or a fine, that owes money, so we can track

13  their finances.

14  Q.   And can you turn now to Government Exhibit 3.  Do you

15  recognize this document?

16  A.   Yes, I do.

17  Q.   What is it?

18  A.   This was the notice that he submitted with his

19  monthly report for April.  I call it the notice and demand

20  to cease and desist letter.

21  Q.   Looking at Government Exhibit 3, are pages 7 and 8

22  the actual probation office monthly report?

23  A.   Yes, it is.

24         MS. SURRATT:  The Government offers Government

25  Exhibit 3.

1          THE COURT:  Any objection?

2          MS. MEILSTRUP:  No objection.

3          THE COURT:  3 is admitted.

4          (Exhibit No. 3 is admitted.)

5    Q.   (BY MS. SURRATT)  And, Officer Nelson, after April's

6    report, which is at Government Exhibit 3, did Mr. Williams

7    submit any additional reports after that?

8    A.   No, he did not.

9    Q.   Did he have an obligation to continue submitting

10   reports that he did not fulfill?

11   A.   Yes, he did.

12   Q.   And is that the way in which he violated the

13   condition of supervised release that we have been

14   discussing?

15   A.   Yes, it is.

16   Q.   All right.  Let's turn now to Violation No. 2.  What

17   is the condition of supervised release underlying this

18   violation?

19   A.   That he failed to make fine and restitution payments

20   as directed.

21   Q.   Specifically, what was Mr. Williams ordered to pay as

22   part of his underlying sentence in this case?

23   A.   At his initial sentencing, the Court ordered him to

24   pay a thousand dollar assessment, a $10,000 fine, and

25   $60,597.80 in restitution.

1   Q.   And how do you know that?

2   A.   From the Judgment that the Court issued.

3   Q.   Has Mr. Williams paid any of those financial

4   obligations that you just mentioned?

5   A.   He did make three payments of $25 while he was in the

6   Bureau of Prisons.  However, once he found out they were

7   taking money from his account to put towards his financial

8   obligation, he refused to cooperate with the program, and

9   then he didn't make any payments while he was on

10  supervision.

11  Q.   Has Mr. Williams expressed to you his position as to

12  his obligation to make payments that are required?

13  A.   Yes, he has.

14  Q.   And what has he said?

15  A.   He believes the Court doesn't have jurisdiction to

16  hold him accountable for any of his conditions, let alone

17  the financial conditions.

18  Q.   And could you please turn back to what is in evidence

19  as Exhibit 2, and look at page 6, please.  Do you see a

20  box in the middle of the page that says "you have a

21  special assessment, restitution, or fine"?

22  A.   Yes, I do.

23  Q.   What did Mr. Williams write in that box?

24  A.   He wrote "no lawful bill under Article 1 Section 10

25  has been served upon me, the sole foreign beneficiary."

1    Q.   After Mr. Williams ceased making payments while he

2    was in the Bureau of Prisons, did he make any payments

3    after that?

4    A.   No, he did not.

5    Q.   Does he still have an obligation under the terms of

6    his supervised release to pay his fine and restitution?

7    A.   Yes, he does.

8    Q.   Now, turning to Violation No. 3, what is the

9    condition of supervised release that underlies this

10   violation?

11   A.   He failed to participate in substance abuse and

12   mental health treatment as directed.

13   Q.   Could you please turn to what is marked as

14   Government's Exhibit 4.  Do you recognize this document?

15   A.   Yes, I do.

16   Q.   What is it?

17   A.   This is a contract program plan that we have to refer

18   him to treatment services; in this case it was to a vendor

19   called Recovery Unlimited.

20   Q.   How do you recognize this document?

21   A.   This document is a form or a document that I created

22   as part of the referral process for treatment.  It

23   notifies the provider what services we're asking for and

24   who is going to pay for them.

25   Q.   And who filled this document out?

1    A.   I did.  I completed the document, signed it, and I

2    had our treatment specialist sign it, and then I reviewed

3    it with Mr. Williams and the treatment provider.

4         MS. SURRATT:  The Government offers Government

5    Exhibit 4 into evidence.

6         THE COURT:  Any objection?

7         MS. MEILSTRUP:  No objection.

8         THE COURT:  4 is admitted.

9         (Exhibit No. 4 is admitted.)

10   Q.   (BY MS. SURRATT)  What dates did you go with

11   Mr. Williams to the treatment provider?

12   A.   Initially, his initial date was on April 26, 2019.

13   Q.   And what happened on that date?

14   A.   Mr. Williams appeared for what they routinely call an

15   intake.  It just kind of talks about what services he is

16   being referred to, how the process works, they gather some

17   background information from him so that when they do the

18   actual assessment, the counselor is aware.

19   Q.   And so what happened after that?

20   A.   When I talked to him, he signed the form, and we set

21   a date for his actual assessment, which was on May 13,

22   2019.

23   Q.   And what happened on May 13, 2019?

24   A.   Mr. Williams showed up to Recovery Unlimited in

25   Colorado Springs, and the counselor advised him that the

1    way he signs his documents, they can't complete the

2    assessment, because he says he is under duress,

3    coercion -- or duress, coercion, or threat.  I am sorry.

4    Q.   Under threat, duress, or coercion.  And, Officer

5    Nelson, do you see that on Government Exhibit 4, in the

6    middle of the page, where he says "in common law, 7th

7    Amendment without prejudice under threats, duress,

8    coercion, without recourse"?

9    A.   Correct.

10   Q.   And so just to clarify, is your testimony that

11   Recovery Unlimited took the position that because that is

12   how Mr. Williams signed the document, they were unable to

13   complete the treatment as proffered?

14   A.   Correct.

15   Q.   What happened after that?

16   A.   Mr. Williams and I talked about his options regarding

17   a treatment assessment.  Since he had kind of exhausted

18   all of our resources as far as treatment providers, I told

19   him that he could find a treatment provider on his own to

20   give him an assessment, as long as he would provide the

21   results to me.  And I gave him 60 days to do so.

22   Q.   And what did he do?

23   A.   He failed to complete the assessment or, if he did,

24   he didn't give me any result.

25   Q.   And is that the manner in which he violated this

1    condition of his supervised release?

2    A.   Yes, it is.

3         MS. SURRATT:  Your Honor, the Government has no

4    further questions.

5         THE COURT:  Cross-examination?

6         MS. MEILSTRUP:  Thank you, Your Honor.

7                    **CROSS-EXAMINATION**

8    **BY MS. MEILSTRUP:**

9    Q.   Good morning.

10   A.   Good morning.

11   Q.   At the intake meeting, your initial intake meeting

12   with Mr. Michael Destry Williams, you talked about

13   reviewing the terms of supervised release; is that

14   correct?

15   A.   Correct.

16   Q.   And did Mr. Destry Williams have any questions for

17   you?

18   A.   A large part of our conversation at the initial

19   meeting was about his citizenship status.

20   Q.   Did he have any questions about specific conditions

21   of supervised release?

22   A.   Not at the initial meeting.  Later on, when I met

23   with him, essentially I gave him all of the documents and

24   then reviewed them with him on the second meeting.  At the

25   second meeting, when we talked about treatment and things

1    of that nature, he would ask questions like:  Are you

2    going to pay me to go?  Who is going to pay for this?

3    What happens if I don't go?  Questions along those lines.

4    Q.   Did he ask any questions specific to the monthly

5    reports that he needed to submit?

6    A.   I don't recall.  I don't believe so.

7    Q.   Okay.  Did he ask any questions about his financial

8    obligations?

9    A.   Not at the initial meeting, that I recall.  Later on,

10   when I would bring it up, when I would talk to him about

11   not making payments, he had kind of some of the same

12   questions, you know, that he asked about treatment:  What

13   happens if I don't pay this?  Things like that.

14   Q.   An what would you tell him when he would ask, what

15   would happen if I don't pay this?

16   A.   I informed him that the Court would be notified and

17   it would be up to the Court to decide which direction they

18   wanted to go if he didn't attend treatment or make any

19   payments.

20   Q.   During your supervision, did you advise him of the

21   revocation proceeding or that that could be an option?

22   A.   I believe so, yes.

23   Q.   Have you ever supervised an American National or an

24   individual that claims to be an American National before?

25   A.   I have.

1    Q.   And did you have any success with supervision of that

2    individual?

3    A.   Depends on how you define "success."  Yes, and no.

4    On one occasion, yes, but, it was after they had been

5    before the Court and been revoked on at least one occasion

6    prior to that.

7    Q.   Okay.  With regards to Mr. Destry Williams' financial

8    obligations, do you know if at that time he was working?

9    A.   He did not tell me that he was working, no.  And he

10   said that he had been trying to apply for disability.

11   Q.   Okay.  Do you know if he had any other source of

12   income?

13   A.   He didn't disclose anything to me, no.

14   Q.   If he had told you that he didn't have any income to

15   pay these financial obligations, how would you have

16   responded?

17   A.   Typically we'd work with him, like, on a payment

18   plan.  If he can verify that he has absolutely zero income

19   coming in, we normally notify the Court, just saying this

20   person just got released, they don't have any income at

21   this time, they don't have the ability to pay, but we

22   continue to work with them and see how they progress

23   through supervision.

24   Q.   Bringing your attention to the Violation No. 3;

25   failure to participate in the mental health, did you

1    communicate with Recovery Unlimited after they raised

2    issue with Mr. Destry Williams' signature?

3    A.   Not after that day, no.  Not after the 13th.

4    Q.   Did you consider calling them and asking them to make

5    an exception to their signatory policy?

6    A.   I didn't.  Prior to -- if you go back to Exhibit 4, I

7    believe it is, he submitted that paperwork, or we reviewed

8    that paperwork on April 26th, at his initial intake.  And

9    when he signed it that way, the counselor and the program

10   director over there had kind of talked about potential

11   issues on if they could see him if he continued to sign

12   that way.

13        So I talked to the program director leading up to

14   May 13th about trying to do an assessment on him.  And

15   they talked about their standards and things like that and

16   said there would be no way for them to do that without

17   having it affect their license moving forward.

18   Q.   You talked about your initial supervision of

19   Mr. Destry Williams.  At that time he was compliant; is

20   that correct?

21   A.   Yes.

22   Q.   And that shifted in April of 2019?

23   A.   Correct.

24   Q.   So, is it fair to say that October 2018 through April

25   2019, he was polite, professional, and compliant?

1    A.   We were able to have an adult conversation about his

2    status and supervision and how we were going to move

3    forward.  When I say he was "compliant," he would show up

4    when he needed to show up, he was submitting his monthly

5    reports, but he wasn't making financial payments, things

6    like that.  But, nothing in those early stages to warrant

7    court action at that time.

8    Q.   Do you recall the date when you decided to file the

9    revocation with the Court?

10   A.   I believe it was August 27, 2019.

11   Q.   And during that time, from April 2019, when you

12   received the cease and desist, did anything occur with

13   supervision from April until that August 2019 date?

14   A.   I was still trying to work with Mr. Williams,

15   especially after the end of April, when he showed up to

16   his intake for treatment.  I thought he was turning the

17   corner at that point.  And then when he -- when we

18   referred him for the mental health assessment, again he

19   showed up but didn't follow through with anything we asked

20   him to do.

21   Q.   Did you notify him that you were considering filing a

22   revocation?

23   A.   Not specifically a revocation.  He had asked, you

24   know, on several occasions, I am not doing treatment, what

25   is going to happen?  How do we move forward?  I am not

1    going to pay -- what if I don't pay my fine, what is going

2    to happen?

3              MS. MEILSTRUP:  Okay.  Thank you.

4              No further questions, Your Honor.

5              THE COURT:  Any redirect?

6              MS. SURRATT:  No, Your Honor.

7              THE COURT:  All right.  Thank you very much, sir,

8    you may step down.

9              Does the Government have any other witnesses?

10             MS. SURRATT:  No, Your Honor.

11             THE COURT:  Ms. Meilstrup, does the defense wish to

12   offer any evidence?

13             MS. MEILSTRUP:  No, Your Honor.

14             THE COURT:  All right.  Based on the evidence

15   presented, both via the verified petition of the probation

16   officer and the testimony of Officer Nelson, the Court

17   finds that the Government has established by a

18   preponderance of the evidence that the defendant has

19   knowingly violated the conditions of his supervised

20   release as alleged in the probation officer's petition

21   with respect to the following violations:

22             One, failure to report to the probation officer and

23   submit written reports as directed, and that on or about

24   October 30, 2018, the defendant was directed to complete

25   written monthly reports and submit them to the probation

1    officer by the 5th date of each month.

2         The defendant failed to submit written monthly

3    reports as directed after May -- I am sorry, after April

4    of 2019 for the months of May, June, and July 2019.

5         As to Allegation No. 2; the defendant failed to

6    make payments toward his fine and restitution as directed

7    by the Court and the probation officer.  And the

8    Government has proven as to Allegation No. 3 that the

9    defendant failed to complete the substance abuse and

10   mental health assessment in which the probation officer

11   directed him to complete on July 13, 2019.

12        The violations by the defendant are Grade C

13   violations, the defendant's Criminal History Category is a

14   III, and that results in a range of imprisonment of 5 to

15   11 months under the policy statements issued by the

16   Sentencing Commission.

17        Pursuant to 18 United States Code Section

18   3583(e)(3), because the underlying offenses were Class B

19   felonies and the statutory maximum term of supervised

20   release was imposed for sentencing, the terms of

21   supervision cannot be extended, but the Court could impose

22   up to 3 additional years of imprisonment, and the Court

23   can also reimpose supervised release.

24        The approach adopted by the Sentencing Commission

25   in Chapter 7 of the Guidelines Manual, Part A, with

1      respect to supervision violations, is that the violation

2      resulting from a defendant's failure to follow the

3      Court-imposed conditions of supervised release is

4      considered as a breach of trust.

5           This Court is charged with sanctioning primarily

6      the defendant's breach of trust, while taking into

7      account, to a limited degree, the seriousness of the

8      underlying violation and the criminal history of the

9      violator.

10          The Court has read both the sentencing statement of

11     Ms. Meilstrup, in which she seeks a sentence of time

12     served, which would be approximately 8-and-a-half months,

13     and the Government's sentencing statement, which seeks 11

14     months.

15          Both parties and probation agree that no further

16     supervised release should be imposed, because it is clear

17     the defendant will not comply with any conditions of

18     supervised release.

19          Now, at this time, I am going to take a recess,

20     because Mr. Williams should be present in the courtroom

21     for his sentencing.

22          I direct that the deputies bring Mr. Williams back

23     into the courtroom for sentencing if he is willing to put

24     on his mask.  If he is not willing to put on his mask, I

25     will consider that to be a disruption of this proceeding

1    and a health hazard to everyone in this courtroom.

2          So, let me know when it is all right for me to come

3    back.

4          (A break is taken from 10:29 a.m. to 10:33 a.m.)

5          THE COURT:  You may be seated.

6          The record will reflect that the defendant is back

7    in the courtroom and he has put on his mask.

8          We are prepared to proceed to sentencing.  I will

9    hear first from Ms. Meilstrup, then I will hear from

10   Ms. Surratt, then finally I will hear from Mr. Williams.

11         So, Ms. Meilstrup, you may proceed.

12         THE DEFENDANT:  Objection.  You have not

13   adjudicated on the habeas corpus or any other petition or

14   writ that has come through this court.  You have ignored

15   due process --

16         THE COURT:  Mr. Williams, you will have the

17   opportunity to speak.

18         THE DEFENDANT:  You are speaking over me again, and

19   you are refusing me --

20         THE COURT:  Because you are not following protocol.

21         THE DEFENDANT:  -- my First Amendment right to

22   speak.

23         THE COURT:  Mr. Williams -- Mr. Williams.

24         THE DEFENDANT:  You are refusing me my First

25   Amendment right to speak and be heard.

1          THE COURT:  You will have that opportunity.  I

2     first want to hear from Ms. Meilstrup, then I will hear

3     from Ms. Surratt, and then finally you will be able to say

4     whatever you want to say, but at the appropriate time.

5          Ms. Meilstrup, you may proceed.

6          MS. MEILSTRUP:  Thank you, Your Honor.

7          As the Court is aware, I am concerned about

8     Mr. Destry Williams' incarceration during this pandemic

9     time.  I filed a motion to re-review his incarceration.  I

10    don't know if Mr. Destry Williams was aware of that.  The

11    motion was, in my opinion, half complete because I didn't

12    have communication with him to discuss what an exit plan

13    would look like.

14         In my sentencing statement, I feel the same way;

15    that there is information there that I find to be

16    persuasive; that Mr. Destry Williams has been found guilty

17    of the lowest level violation of supervised release.  It

18    is a Level C.  It does not involve a new offense.  It does

19    not involve violence.  It does not involve a controlled

20    substance.

21         And, again, I reiterate, as I have done in the

22    motion to reconsider incarceration and in the sentencing

23    statement, that incarceration during this time posses new

24    threats, and that I can't imagine the discomfort and

25    concern and stress that Mr. Destry Williams may have

1   endured over these last couple of months -- not last

2   couple of months, since October of 2019, incarcerated in a

3   facility as the pandemic continues to rise.

4        It is hard to say if the numbers are going to

5   continue to rise or if they are going to level out.  So,

6   for those reasons, Your Honor, because I feel

7   incarceration is dangerous at this time, unnecessarily

8   detrimental, and because of the offense level, I would ask

9   that this Court impose a sentence of time served.

10       THE COURT:  All right.  Thank you.

11       Ms. Surratt?

12       MS. SURRATT:  Yes, Your Honor.  I have addressed

13  the effects that the Government believes that the COVID-19

14  pandemic should have on this Court's sentencing decision,

15  both in my response to Ms. Meilstrup's sentencing

16  statement, as well as my response to her earlier request

17  for relief given the pandemic.

18       The bottom line is the facility at which

19  Mr. Williams is being held is doing an excellent job of

20  making sure that inmates and staff are both safe.  And it

21  is the Government's view the pandemic should not weigh

22  into the Court's decision in this case.

23       Rather, the Government is asking for a sentence of

24  11 months, with no additional supervised release, despite

25  the fact that the Government is obviously loathe to reward

1    that behavior.  And that is sort of what it feels like to

2    say that we don't want to impose additional supervised

3    release.

4         But, it is my view, and I assume it is also the

5    view of the probation department, that supervised release

6    is a time-consuming resource that should be reserved for

7    releasees who actually want to benefit from the services

8    the probation officers provide.

9         And, here, it is clear from Officer Nelson's

10   testimony that he went above and beyond, and gave

11   Mr. Williams chance and chance to comply with the terms of

12   this Court's judgment, and he just refused.

13        So I think 11 months is appropriate, as it is

14   largely a punitive measure.  As the Court noted, the

15   function of supervised release in these proceedings is to

16   address the noncompliance with court orders.  It is less

17   about what he did and more about the fact that

18   Mr. Williams isn't obeying the Court's orders.

19        And it is clear that Mr. Williams has some very

20   strongly-held political beliefs, but that is no excuse.

21   He is a grown man.  He could follow the Court's orders if

22   he wanted to, he is choosing not to.

23        And simply saying some things that he believes that

24   are different from what the rest of us believe doesn't

25   mean that he is excused from obeying this Court's orders

1    that is part of the Judgment, and he is well aware of the

2    orders.

3            So, Your Honor, I think 11 months is appropriate.

4    And I recommend that no additional supervised release is

5    imposed.

6            THE COURT:  All right.  Thank you.

7            Mr. Williams, now it is your turn.

8            THE DEFENDANT:  Well, again, I am not the defendant

9    in your case.  I am not the United States citizen, I am an

10   American National.  You have been supplied with more

11   documentation and from the Secretary of State of the

12   United States showing that I am not a United States

13   citizen.  That is, your corporate court under admiralty

14   jurisdiction, as your flag has shown, has no jurisdiction

15   or authority over an American National.

16           Second, the Supreme Court has already ruled in

17   *Heyman v. United States*, 2019, that supervised release is

18   illegal, unlawful, and unconstitutional if they have not

19   had a second jury trial of their peers.  I have never even

20   had a first jury trial of my peers as an American

21   National, much less a second one.  Therefore, supervised

22   release is a second sentence.

23           Without a jury trial, to sit here and take away my

24   liberties, this is unconstitutional and has already been

25   ruled on by the Supreme Court and makes everything you are

1   saying here moot.

2        Second, from our understanding, the Attorney

3   General bar has already ordered that no supervised release

4   be arrested unless they have committed a new crime.  And

5   anybody that is under supervised release, as long as they

6   are not violent, which I am not, are to be released

7   immediately, and you are violating those rights.

8        You have had three habeas corpus put under this

9   Court, and you have refused to answer one of them.  You

10  have had petitions put into this Court, and you have

11  refused to answer one of them.

12       You have given me no hearing on persona or subject

13  matter jurisdiction had when it was challenged.  And you

14  continue to violate my rights as an American National, a

15  citizen of the sovereign union states.  I demand my

16  Seventh Amendment right to suits at common law, not an

17  admiralty court, of special law to be tried under American

18  Nationals.  And you have refused every right that I have

19  had and I have asked for, and a right is supposed to be

20  given freely without verbal or written request.

21       You have answered not one of my challenges to this

22  corporate court.  You have no oath of office.  You have no

23  fiduciary bond, as the Constitution requires.  You are

24  impersonating a public official according to the

25  Constitution, and this is the highest law of the land.

1          And anybody that is within law knows the difference

2     between a special law and judicial law of this nation.  It

3     is even when Congress asked people like Comey and the

4     other judges who have been put in -- or, excuse me, and

5     judges who have been put in, they ask them, do you know

6     the difference between special law of the corporation and

7     judicial law, constitutional law, common law of this

8     republic nation.  And, of course, they say yes, but nobody

9     in here seems to understand or claim to not know that.

10    And ignorance of the law is no excuse.

11         So, at no time have I given this Court permission,

12    agreed to any of your corporate contracts whatsoever to

13    participate.  Everything that I did with Joel was a notice

14    of my standing and status as my jurisdiction as an

15    American National.  Not one time that I met him did I

16    agree to do anything, okay.

17         And I informed him over with paperwork that

18    established this; that he was informed of the two

19    different jurisdictions and failed to comply.  And anybody

20    can run my ID from the Secretary of State and show that I

21    am not a United States citizen, and you have all refused.

22         The marshal service came to pick me up with a

23    warrant that doesn't even have a judge's signature on the

24    front or a name.  And the first marshal said there is a

25    problem with the warrant.  And they refused from that

1    point on to correctly run or verify my citizenship.  And

2    you have held me illegally, unlawfully, and

3    unconstitutionally.  Thank you.

4         THE COURT:  All right.  The evidence presented

5    indicates that this defendant just thinks he is not bound

6    by the orders of this Court or by the laws of the United

7    States, and that he willfully violates them as he sees

8    fit.

9         On March 4, 2014, the defendant was sentenced by

10   this Court to 71 months of imprisonment and 5 years of

11   supervised release for 10 counts of tax evasion and bank

12   fraud.  His supervision commenced on August 22, 2018, and

13   is set to expire on August 21, 2023.

14        When he was first released on supervision he

15   resided in a residence on shared property with his

16   mother's residence.  He was referred for a mental health

17   and substance abuse assessment.  He reported for that

18   assessment, but he signed the paperwork in a manner that

19   prevented the counselor from completing the assessment.

20   He agreed to do so, but would only do so by adding the

21   wording "under threats, duress, coercion."  The treatment

22   provider was unable to provide services to him under those

23   circumstances.

24        The probation officer gave the defendant an

25   opportunity to find his own licensed provider to complete

1    an assessment, and the defendant failed to do so.

2         The probation officer directed the defendant to

3    make monthly payments toward his outstanding financial

4    obligations.  He failed to complete any of the requested

5    financial forms and failed to make any payments toward his

6    court-ordered financial obligations.

7         He does not acknowledge that he has any criminal

8    monetary penalties, and indicated in his written monthly

9    reports that "No lawful bill under Article 1 Section 10

10   has served upon me, the sole foreign beneficiary."

11        The defendant was confrontational and challenging

12   during his time on supervised release.  He initially

13   reported as directed and portrayed he would comply, but

14   over time his confrontational attitude and opposition to

15   supervised release increased.

16        Finally, in April of 2019, he submitted his monthly

17   written report with an attached, "Notice and demand to

18   cease and desist" letter, which indicated that he is

19   recognized as an "American National and not a U.S.

20   citizen."  He demanded to be removed from the docket and

21   registry and to "cease and desist all trespasses" upon

22   him.  And from that time forward he failed to submit any

23   written reports to the probation office.

24        He was served with a summons to appear in court for

25   violations of supervised release on September 6, 2019.  He

1    refused to accept that summons because he claimed it was

2    not issued in the correct court.  He continues to claim

3    that he is not a U.S. citizen but that he is an American

4    National.  And he told the probation officers that they

5    were trespassing on his property and if they didn't leave

6    he would charge them with treason and they would be

7    publicly hung.

8        He is under the belief that this Court does not

9    have jurisdiction of his case and that federal supervision

10   does not apply to him.  Based on his prior criminal

11   history and his conduct on supervised release, the Court

12   finds that it makes no sense to reimpose a sentence of

13   supervised release because it is clear that he will not

14   comply.

15       Both the Government and the Assistant -- I am

16   sorry, both the probation office and Assistant United

17   States Attorney recommend the top of the advisory

18   guideline range of 11 months as the appropriate sentence,

19   and both agree that Mr. Williams should not be placed on

20   any further supervised release because he merely won't

21   comply.

22       This Court agrees that it is futile to impose

23   further supervised release because it is apparent

24   Mr. Williams will just fail to comply and we will be going

25   through these same proceedings before the end of the year.

1          However, I find that the defendant's absolute

2     refusal to comply with any of the conditions of supervised

3     release is absolutely unacceptable.  I refuse to reward

4     him for flaunting the law.  And an order sanctioning him

5     only to 11 months of imprisonment and then letting him

6     walk free is not a sufficient sentence.

7          I have seen so many defendants come through this

8     courtroom on supervised release violation petitions who

9     have tried to comply with the conditions but they may be

10    drug addicts or they may be mentally ill, and they find

11    their way back to me on violations, and they have been

12    sentenced to higher sentences.

13         Someone like Mr. Williams, who reaps the benefits

14    and privileges of living here in the United States should

15    not be allowed to flaunt the law and ignore the law in the

16    way that he has.  To give him 11 months would be a slap on

17    the wrist, and then he is allowed to go his merry way.

18         As such, I have decided that a variant sentence

19    higher than the top of the advisory guideline range of 11

20    months of imprisonment is justified for this blatant

21    refusal to comply with supervised release.

22         It is ordered and adjudged that the defendant's

23    supervised release is revoked, and the defendant is

24    sentenced to the custody of the Bureau of Prisons for a

25    period of 24 months.

1          The Court recommends that the Bureau of Prisons

2     credit the defendant with 269 days spent in official

3     detention prior to sentencing.  The defendant is ordered

4     to pay the balance of the special assessment, the fine,

5     and the restitution outstanding.

6          Subsequent to service of the revocation sentence,

7     the defendant's payment of the outstanding obligations

8     will be monitored by the financial litigation unit of the

9     United States Attorney's Office pursuant to 18 United

10    States Code Section 3612 and 3613.  No term of supervised

11    release following imprisonment is imposed.

12         Mr. Williams, you are advised that you have the

13    right to appeal this sentence.  If you desire to appeal, a

14    Notice of Appeal must be filed with the Clerk of the Court

15    within 14 days after entry of Judgment or your right to

16    appeal will be lost.

17         If you are not able to afford an attorney for an

18    appeal, the Court will appoint one to represent you.  And,

19    if you request, the Clerk of the Court must immediately

20    prepare and file a Notice of Appeal on your behalf.

21         I want to thank Deputy United States Marshals for

22    your assistance in this case.

23         I hereby remand Mr. Williams to the custody of the

24    United States Marshals for the District of Colorado.

25         Court will be in recess.

1          (Proceedings conclude at 10:48 a.m.)

2

3          **R E P O R T E R ' S     C E R T I F I C A T E**

4

5          I, Darlene M. Martinez, Official Certified

6   Shorthand Reporter for the United States District Court,

7   District of Colorado, do hereby certify that the foregoing

8   is a true and accurate transcript of the proceedings had

9   as taken stenographically by me at the time and place

10  aforementioned.

11

12

13

14          Dated this 13th day of October, 2020.

15

16

17

18          _____

19          s/Darlene M. Martinez

20          RMR, CRR

21

22

23

24

25